# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**

**COUNTY OF KINGS**

----------------------------------------------------------------------X

ADAM SHREM,

Index No. ______________ / 2026

Plaintiff,

Date Index No. Purchased: __________

-against-

**SUMMONS**

EXPERIAN INFORMATION SOLUTIONS, INC.,

Defendant.

----------------------------------------------------------------------X

**To the above-named Defendant:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is the residence of the Plaintiff, Adam Shrem, who resides in Brooklyn, New York 11229, in the County of Kings.

Plaintiff designates the County of Kings as the place of trial.

Dated: New York, New York
June 18, 2026

THE LAW OFFICE OF
ELLIOT M. ELO, ESQ. PLLC

By: s/ Elliot M. Elo
Elliot M. Elo, Esq.
42 West 48th Street, Floor 2
New York, New York 10036-1701
Telephone: (212) 302-1257
Facsimile: (212) 302-1648
Email: elliot@elolawfirm.com
*Attorney for Plaintiff*

**TO:**

**Experian Information Solutions, Inc.**
a foreign business corporation, DOS ID No. 2076147,
to be served via the Secretary of State of the State of New York, as agent pursuant to Section 306 of the Business Corporation Law,

with a copy to be mailed by the Secretary of State to the address on file:
475 Anton Boulevard, Costa Mesa, California 92626.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

----------------------------------------------------------------------X

ADAM SHREM,

Index No. ______________ / 2026

Plaintiff,

**VERIFIED COMPLAINT**

-against-

JURY TRIAL DEMANDED

EXPERIAN INFORMATION SOLUTIONS, INC.,

Defendant.

----------------------------------------------------------------------X

Plaintiff Adam Shrem ("Plaintiff" or "Shrem" or "Mr. Shrem"), by his attorney, Elliot M. Elo, Esq. of The Law Office of Elliot M. Elo, Esq. PLLC, as and for his Verified Complaint against Defendant Experian Information Solutions, Inc. ("Experian" or "Defendant"), alleges as follows.

## NATURE OF THE ACTION

1. This is a consumer protection action brought under the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. section 1681, *et seq*., and Article 25 of the New York General Business Law, GBL section 380, *et seq*.

2. This action arises from Defendant's failure to follow reasonable procedures to assure maximum possible accuracy in Plaintiff's consumer file and consumer reports, and from Defendant's failure to clearly and accurately disclose to Plaintiff all information contained in Plaintiff's consumer file at the time of his request.

3. Plaintiff seeks actual damages, statutory damages, punitive damages, and reasonable attorney's fees and costs.



Doc ID: ca5df5346776c37722b351678e9a1f6aecaf3538

Case 1:26-cv-04317-BMC Document 1-1 Filed 07/17/26 Page 5 of 85 PageID #: 8

## THE PARTIES

4. Plaintiff Adam Shrem is a natural person.

5. Plaintiff is an individual.

6. Plaintiff resides in Brooklyn, New York 11229.

7. Plaintiff's residence is located within the County of Kings.

8. Plaintiff resides in the State of New York.

9. By reason of the foregoing, Plaintiff is a "consumer" within the meaning of 15 U.S.C. section 1681a(c).

10. By reason of the foregoing, Plaintiff is a "consumer" within the meaning of GBL section 380-a(b).

11. Defendant Experian Information Solutions, Inc. is a foreign business corporation organized under the laws of Ohio.

12. Defendant is authorized to do business in the State of New York and is registered with the New York Department of State under DOS identification number 2076147.

13. Defendant maintains a registered agent for service of process in the State of New York, namely C T Corporation System, located at 28 Liberty Street, New York, New York 10005.

14. Defendant regularly conducts business in the County of Kings and throughout the State of New York.

15. Defendant regularly assembles information about consumers, including Plaintiff, into consumer files.


Doc ID: ca5df5346776c37722b351678e9a1f6aecaf3538

16. Defendant regularly evaluates information about consumers, including Plaintiff, for the purpose of furnishing consumer reports.

17. Defendant regularly furnishes consumer reports concerning consumers, including Plaintiff, to third parties.

18. Defendant furnishes consumer reports to third parties in exchange for monetary fees.

19. Defendant uses the mails and the facilities of interstate commerce to assemble, prepare, and furnish consumer reports.

20. Defendant maintained a consumer file concerning Plaintiff within the meaning of 15 U.S.C. section 1681a(g).

21. By reason of the foregoing, Defendant is a "consumer reporting agency" within the meaning of 15 U.S.C. section 1681a(f).

22. By reason of the foregoing, Defendant is a "consumer reporting agency" within the meaning of GBL section 380-a(e).

23. Defendant prepared consumer reports concerning Plaintiff.

24. Defendant furnished consumer reports concerning Plaintiff to third parties.

25. The information at issue in this Complaint bears on Plaintiff's credit worthiness, credit standing, and credit capacity.

26. The information at issue was collected, assembled, and used or expected to be used for the purpose of serving as a factor in establishing Plaintiff's eligibility for credit.


Doc ID: ca5df5346776c37722b351678e9a1f6aecaf3538

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction over this action pursuant to the New York Constitution, Article VI, section 7.

28. The Fair Credit Reporting Act provides for concurrent jurisdiction in state courts pursuant to 15 U.S.C. section 1681p.

29. This Court has personal jurisdiction over Defendant because Defendant is authorized to do business in the State of New York and transacts business within the State of New York.

30. Venue is proper in the County of Kings pursuant to CPLR 503(a) because Plaintiff resides in the County of Kings.

31. A substantial part of the events giving rise to Plaintiff's claims occurred in the County of Kings, where Plaintiff resided when the inaccurate consumer reports were prepared and disseminated.

32. Defendant conducts continuous, systematic, and substantial business in New York by assembling, maintaining, marketing, selling, and furnishing consumer reports concerning New York consumers, including consumers residing in Kings County.

33. Defendant's conduct caused injury in Kings County because Plaintiff resided in Kings County, requested and received the Consumer File Disclosure there, reviewed and relied upon the disclosure there, suffered credit-related harm there, and experienced the resulting emotional distress, time loss, and informational injury there.


Doc ID: ca5df5346776c37722b351678e9a1f6aecaf3538

## STATUTORY AND REGULATORY FRAMEWORK

34. The Fair Credit Reporting Act requires a consumer reporting agency to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom a consumer report relates.

35. This requirement is codified at 15 U.S.C. section 1681e(b).

36. Article 25 of the New York General Business Law imposes a parallel requirement that a consumer reporting agency follow reasonable procedures to assure maximum possible accuracy.

37. This parallel requirement is codified at GBL section 380-j(e).

38. The Fair Credit Reporting Act requires a consumer reporting agency, upon the request of a consumer, to clearly and accurately disclose to the consumer all information in the consumer's file at the time of the request.

39. This requirement is codified at 15 U.S.C. section 1681g(a)(1).

40. On January 23, 2024, the Consumer Financial Protection Bureau issued an Advisory Opinion concerning the file-disclosure obligations imposed by 15 U.S.C. § 1681g(a).

41. The CFPB Advisory Opinion confirms that a consumer reporting agency must clearly and accurately disclose all information in the consumer's file at the time of the request and the sources of that information.

42. The CFPB Advisory Opinion confirms that "all information in the consumer's file" includes information that the consumer reporting agency provided, could provide, or might provide to a user of a consumer report.


Doc ID: ca5df5346776c37722b351678e9a1f6aecaf3538

43. The CFPB Advisory Opinion further confirms that a consumer reporting agency must disclose information in a manner that permits the consumer to understand the information, verify the information, identify inaccuracies, and exercise dispute rights.

44. The CFPB Advisory Opinion further confirms that a consumer reporting agency must disclose the sources of the information in the consumer's file, including original sources and intermediary or vendor sources.

45. Defendant has been on notice of the CFPB's authoritative interpretation of 15 U.S.C. § 1681g(a) since January 23, 2024.

46. Defendant's failure to comply with that interpretation was knowing, reckless, and objectively unreasonable.

47. The consumer reporting industry has adopted a standardized electronic data reporting format known as the Metro 2 Format.

48. The Metro 2 Format is published by the Consumer Data Industry Association in the Credit Reporting Resource Guide.

49. The Metro 2 Format defines a standardized data dictionary that governs how each data field in a consumer tradeline is to be reported.

50. As reflected in Exhibit B, the 2024 Credit Reporting Resource Guide states that the Metro 2 Format is accepted by all consumer reporting agencies and enables the reporting of accurate, complete, and timely credit information.

51. The 2024 Credit Reporting Resource Guide states that the Metro 2 Format allows credit information to be added and mapped to the consumer's file with greater consistency.

52. The 2024 Credit Reporting Resource Guide states that an industry standard for reporting consumer accounts is intended to ensure the integrity and consistency of credit information.

53. Defendant is not a passive recipient of Metro 2 data. Defendant is one of the nationwide consumer reporting agencies that participates in, uses, receives, maps, stores, interprets, validates, and furnishes consumer credit information through Metro 2 data standards.

54. Defendant therefore knew or should have known that a paid, closed, or final-status account must not be disclosed or furnished in a manner that leaves the current balance field ambiguous, blank, missing, or unexplained.

55. As reflected in Exhibit B, under the Metro 2 Format, Account Status Code 13 means "paid or closed account/zero balance."

56. Under the Metro 2 Format, Account Status Code 13 is a final account status.

57. Under the Metro 2 Format, an account reported with Account Status Code 13 should have a balance amount of zero ($0).

58. Under the Metro 2 Format, for credit line, open, and revolving portfolio types, an account reported with Account Status Code 13 should no longer be available for use and the balance amount should be zero ($0).

59. As reflected in Exhibit C, under the Metro 2 Format, a final account status code must be reported when an account is ultimately paid or closed with a zero ($0) balance.

60. A disclosure or consumer report that displays a dash, blank, missing value, or unexplained non-numeric symbol in the current balance field for a paid, closed, or final-status account is inconsistent with the Metro 2 requirement that the balance amount be zero ($0).

61. As reflected in Exhibit E, in 2015, Defendant entered into a Settlement Agreement and Assurance of Voluntary Compliance with the Attorney General of the State of New York and the attorneys general of more than thirty other states.

62. Defendant has long been aware that courts have construed the phrase "all information in the consumer's file" broadly to require disclosure of information maintained by a consumer reporting agency concerning the consumer.

63. Defendant has further been aware that federal regulators have consistently interpreted the disclosure obligations imposed by 15 U.S.C. § 1681g(a) broadly and in favor of consumer access to information.

64. In that Settlement Agreement and Assurance of Voluntary Compliance, Defendant agreed to cease accepting consumer data submitted in the legacy Metro 1 reporting format.

65. In that Settlement Agreement and Assurance of Voluntary Compliance, Defendant agreed to use commercially reasonable efforts to migrate furnishers to the Metro 2 Format.

66. In that Settlement Agreement and Assurance of Voluntary Compliance, Defendant acknowledged its duty to follow reasonable procedures to assure maximum possible accuracy of consumer credit information under 15 U.S.C. section 1681e and GBL section 380-j(e).

67. Defendant has therefore been on notice since at least 2015 of the Metro 2 Format standard and of its statutory accuracy obligations.

68. The 2015 Settlement Agreement arose from an investigation into, among other things, the accuracy of consumer credit information maintained by the nationwide consumer reporting agencies and their practices regarding investigation of consumer disputes.

69. The 2015 Settlement Agreement recognized that consumer reports are used by creditors, insurers, employers, landlords, and other users, and that errors in consumer reports can negatively impact consumers.

70. Defendant therefore had actual regulatory notice that accuracy, dispute processing, file maintenance, furnisher oversight, and consumer-facing disclosures are core statutory duties, not optional formatting preferences.

71. Defendant's continued disclosure and dissemination of repeated dash balance fields on paid, closed, and settled accounts after that regulatory notice supports willful noncompliance.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Consumer File and the Consumer File Disclosure

72. Plaintiff requested disclosure of his consumer file from Defendant pursuant to 15 U.S.C. section 1681g(a).

73. On or about April 28, 2026, Defendant generated and issued to Plaintiff a written disclosure of information from Plaintiff's consumer file.

74. As used in this Complaint, the term "Consumer File Disclosure" refers to the consumer file disclosure generated and issued by Defendant to Plaintiff on or about April 28, 2026 in response to Plaintiff's request under 15 U.S.C. § 1681g(a), bearing report number 2773-3585-84.

75. Defendant generated and issued the Consumer File Disclosure to Plaintiff on or about April 28, 2026.

76. Plaintiff possesses the Consumer File Disclosure and will produce it in discovery.

77. The allegations contained in this Complaint concerning the contents of the Consumer File Disclosure are based upon Plaintiff's review of the disclosure and the information contained therein.

78. Plaintiff does not annex the Consumer File Disclosure itself because it contains sensitive personal identifying information, detailed account history, consumer-reporting data, and private financial information that should not be placed in the public record.

79. Instead, Plaintiff annexes summary charts and public regulatory or industry-standard excerpts that identify and support the specific allegations pleaded herein without publicly filing Plaintiff's full Consumer File Disclosure.

80. The annexed exhibits are not intended to replace the Consumer File Disclosure, which Plaintiff possesses and will produce in discovery, but are offered to summarize the specific defects, industry standards, regulatory notice, and third-party-access facts alleged in this Complaint.

81. As used in this Complaint, the term "file" or consumer file refers to all information on Plaintiff recorded and retained by Defendant, regardless of the medium in which the information is stored, within the meaning of 15 U.S.C. section 1681a(g) and GBL section 380-a(g).

82. The Consumer File Disclosure was represented by Defendant as the written disclosure of information contained in Plaintiff's consumer file in response to Plaintiff's request under 15 U.S.C. § 1681g(a), and Plaintiff reasonably understood the disclosure to be Defendant's production of the information Defendant chose to disclose from his consumer file.

83. Defendant did not state that the Consumer File Disclosure excluded underlying Metro 2 data fields maintained in Plaintiff's file.

84. Defendant did not state that the Consumer File Disclosure excluded internal field values, current-balance values, source codes, furnisher codes, compliance condition codes, account status codes, payment rating values, or other data elements that Defendant maintained and could provide to users.

85. Defendant did not clearly disclose whether each dash appearing in the current balance field was the actual value maintained in Plaintiff's file or merely a display substitute selected by Defendant.

86. Defendant did not clearly disclose the source of each dash balance field, including whether the dash originated from a furnisher, Defendant's own display logic, Defendant's own data mapping, Defendant's own suppression rules, Defendant's own formatting process, or an intermediary/vendor system.

87. The Consumer File Disclosure identifies seventy-two (72) accounts.

88. As summarized in Exhibit F, the Consumer File Disclosure identifies fifteen (15) hard inquiries.

89. Each hard inquiry reflects that a third party requested or obtained consumer-report information concerning Plaintiff from Defendant.

90. Upon information and belief, Defendant disseminated consumer reports concerning Plaintiff to third parties, including one or more entities reflected as hard-inquiry users in the Consumer File Disclosure, during the same general period in which Defendant

maintained the inaccurate and materially misleading tradeline information described below.

91. Plaintiff will identify each third-party recipient with greater specificity after discovery because Defendant possesses the complete record of each report recipient, report date, permissible purpose, and report content.

92. Defendant's own Consumer File Disclosure confirms that third parties requested or obtained consumer reports concerning Plaintiff, and those third-party accesses make dissemination plausible at the pleading stage.

93. The hard inquiries are not alleged merely as background. Each hard inquiry is direct evidence that a third party accessed, requested, or obtained a consumer report concerning Plaintiff.

94. Because the inaccuracies described herein existed in Defendant's file at the same time Defendant was furnishing consumer reports concerning Plaintiff, it is plausible and likely that the inaccurate and materially misleading information was disseminated to one or more third-party users.

95. Defendant possesses the best evidence of dissemination, including report-recipient logs, inquiry records, permissible-purpose records, archived report images, report-output data, and records identifying the contents of consumer reports furnished to third parties.

96. Plaintiff will seek those records in discovery.

**B. Defendant Reports Paid and Closed Accounts With a Blank Current Balance**

97. The Consumer File Disclosure reflects numerous tradelines reported with a status of paid and closed.

98. For each such tradeline, the Consumer File Disclosure displays the current balance field as a dash rather than as a reported value of zero ($0).

99. As reflected in Exhibit A, by way of example, the tradeline identified as ADS/COMENITY/C21, opened October 9, 2016, is reported as paid and closed and displays a balance field shown as a dash.

100. By way of example, the tradeline identified as ADS/COMENITY/NY&CO, opened May 8, 2015, is reported as paid and closed and displays a balance field shown as a dash.

101. By way of example, the tradeline identified as AFFINITY FCU, opened November 22, 2016, is reported as paid and closed and displays a balance field shown as a dash.

102. By way of example, the tradeline identified as BANK OF AMERICA, opened September 14, 2018, is reported as paid and closed and displays a balance field shown as a dash.

103. By way of example, the tradeline identified as BARCLAYS BANK DELAWARE, opened November 20, 2011, is reported as paid and closed and displays a balance field shown as a dash.

104. By way of example, the tradeline identified as CAP1/L&T, opened January 18, 2013, is reported as paid and closed and displays a balance field shown as a dash.

105. By way of example, the tradeline identified as CAPITAL ONE, opened July 28, 2007, is reported as paid and closed and displays a balance field shown as a dash.

106. By way of example, the tradeline identified as CITI CARDS/CITIBANK, opened August 9, 2017, is reported as paid and closed and displays a balance field shown as a dash.


Doc ID: ca5df5346776c37722b351678e9a1f6aecaf3538

107. By way of example, the tradeline identified as COMENITY BANK/PIER 1, opened August 28, 2009, is reported as paid and closed and displays a balance field shown as a dash.

108. By way of example, the tradeline identified as SYNCB/HOME, opened June 21, 2015, is reported as paid and closed and displays a balance field shown as a dash.

109. By way of example, the tradeline identified as AMERICAN EXPRESS, opened September 30, 1996, is reported as paid and closed and displays a balance field shown as a dash.

110. As summarized in Exhibit A, the Consumer File Disclosure reflects no fewer than thirty-eight tradelines reported as paid and closed in which the current balance field is displayed as a dash rather than as a value of zero ($0).

111. The current balance information displayed in the Consumer File Disclosure reflects the information Defendant maintains in Plaintiff's consumer file.

112. Upon information and belief, Defendant reported the same current balance information for these tradelines in consumer reports concerning Plaintiff that Defendant furnished to third parties.

113. Each such tradeline corresponds to a paid or closed account that, under the Metro 2 Format, is to carry a current balance of zero ($0).

114. A current balance field reported as a dash does not affirmatively communicate to a user of a consumer report that the account carries a balance of zero ($0).

115. A current balance field reported as a dash is materially different from a current balance field reported as a value of zero ($0).

116. A user of a consumer report reviewing a paid and closed tradeline expects, consistent with the Metro 2 Format, that the current balance will be reported as zero ($0).

117. A current balance field reported as a dash on a paid and closed account creates a materially misleading impression as to whether the account carries an outstanding balance.

118. The inaccuracy is objectively verifiable from the face of Defendant's own disclosure because Defendant simultaneously disclosed account status information showing that the accounts were paid and closed and balance information showing no affirmative zero ($0) balance.

119. Defendant did not need to resolve a legal dispute to determine the inaccuracy.

120. Defendant did not need a court order, contract interpretation, bankruptcy determination, or furnisher-side legal judgment to determine the inaccuracy.

121. Defendant needed only to compare the account status field against the current balance field.

122. That comparison was capable of being performed by automated procedures before Defendant disclosed the Consumer File Disclosure or furnished any consumer report.

123. The failure to perform that comparison across dozens of tradelines demonstrates the absence of reasonable procedures.

124. A dash does not communicate whether the balance is zero, unknown, unavailable, omitted, missing, suppressed, unresolved, or otherwise not reported.

125. A current balance of zero ($0) communicates a materially different message than a blank or dashed current balance field.

126. A creditor, lender, insurer, landlord, employer, or consumer reviewing a tradeline displaying a dash in the current balance field may reasonably understand the tradeline differently than a tradeline displaying an affirmative balance of zero ($0).

127. The difference is material because current balance is one of the primary data fields used to evaluate a consumer's present indebtedness.

**C. Defendant Reports a Zero Balance on Other Closed Accounts in the Same Disclosure**

128. The Consumer File Disclosure reflects that Defendant is capable of reporting a current balance of zero ($0) on a closed account.

129. The tradeline identified as BANK OF AMERICA, opened July 3, 2001, is reported as closed and displays a current balance of zero ($0) with a balance update date of January 5, 2019.

130. The tradeline identified as BANK OF AMERICA, opened June 24, 2000, is reported as closed and displays a current balance of zero ($0) with a balance update date of March 25, 2018.

131. Defendant therefore reported a current balance of zero ($0) on certain closed tradelines in the same Consumer File Disclosure in which it reported a dash on other closed tradelines.

132. Defendant's reporting of a current balance of zero ($0) on certain closed tradelines demonstrates that Defendant's systems and procedures are capable of reporting a zero ($0) current balance on a closed account.

133. Defendant's inconsistent treatment of the current balance field across closed tradelines in a single Consumer File Disclosure demonstrates the absence of a reasonable procedure to assure the internal consistency and accuracy of that field.

134. Defendant did not need additional information from any furnisher to detect the inconsistency because the inconsistency was apparent from the information already maintained within Defendant's own systems.

135. Defendant possessed all information necessary to compare account status information against current balance information before furnishing consumer reports or issuing the Consumer File Disclosure.

136. Defendant possessed within its own systems all information necessary to detect the inconsistency between the paid and closed status and the blank current balance field.

**D. Defendant Reports a Settled Account With a Blank Current Balance**

137. As reflected in Exhibit A, the tradeline identified as AMERICAN EXPRESS, opened February 10, 2019, is reported with a status of paid in settlement and a notation that three thousand one hundred eighty-nine dollars was written off.

138. For that tradeline, the current balance field is reported as a dash rather than as a value of zero ($0).

139. A current balance field reported as a dash on an account reported as paid in settlement does not communicate whether any balance remains outstanding on the settled obligation.


Doc ID: ca5df5346776c37722b351678e9a1f6aecaf3538

140. A current balance field reported as a dash on an account reported as paid in settlement creates a materially misleading impression as to Plaintiff's present liability on that account.

141. As reflected in Exhibit C, the Metro 2 Format provides that an account reported as "Account Paid in Full for Less than the Full Balance" requires Account Status Code 13 or Account Status Codes 61 through 65 and a Current Balance of zero ($0).

142. The AMERICAN EXPRESS tradeline identified in Exhibit A is reported as paid in settlement, which reflects that the obligation was resolved for less than the full balance.

143. Under the Metro 2 Format, an account reported as paid in settlement should therefore be reported with a current balance of zero ($0).

144. Defendant instead reported the current balance field as a dash.

145. Reporting a dash rather than an affirmative current balance of zero ($0) on a settled account is inconsistent with the Metro 2 reporting standard reflected in Exhibit C and creates a materially misleading impression regarding whether any balance remains owing.

**E. Defendant Reports Incomplete Payment History**

146. The tradeline identified as CITI TY MC/CBNA is reported with a date opened of January 1, 2009.

147. The payment history for that tradeline as set forth in the Consumer File Disclosure begins in the year 2014.

148. The payment history for that tradeline as set forth in the Consumer File Disclosure does not extend back to the date the account was opened.


Doc ID: ca5df5346776c37722b351678e9a1f6aecaf3538

149. The account was opened on January 1, 2009.

150. The payment history displayed by Defendant begins only in 2014.

151. Defendant's disclosure therefore omits approximately five years of account history between account opening and the beginning of the payment history displayed in the Consumer File Disclosure.

152. Plaintiff was unable to determine from the Consumer File Disclosure whether Defendant maintained additional payment history, suppressed additional payment history, failed to disclose additional payment history, or lacked such information entirely.

153. The omission prevented Plaintiff from determining whether Defendant was maintaining and reporting complete historical information concerning the tradeline.

**E-1. Defendant Failed to Clearly Disclose the Meaning of the Dash Balance Fields**

154. The Consumer File Disclosure repeatedly displays dash symbols in current balance fields.

155. Defendant does not explain the meaning of the dash symbols.

156. Defendant does not disclose whether a dash represents a balance of zero ($0), missing information, unavailable information, unknown information, omitted information, or another value.

157. Defendant does not disclose whether the dash reflects the actual value maintained in Plaintiff's file or a display substitute for another value.

158. As a result, Plaintiff could not determine the actual information maintained by Defendant concerning the affected tradelines.

159. Defendant therefore failed to clearly and accurately disclose information maintained in Plaintiff's file.

**E-2. Defendant Failed to Disclose the Sources of Information**

160. The Fair Credit Reporting Act requires a consumer reporting agency to disclose the sources of information contained in a consumer's file.

161. The CFPB has confirmed that this obligation includes disclosure of original sources and intermediary or vendor sources.

162. Defendant failed to disclose the source of the dash balance fields appearing on the tradelines described herein.

163. Defendant failed to disclose whether the dash balance fields originated from the furnishers, Defendant's own internal systems, Defendant's own display logic, Defendant's own suppression rules, a vendor, an intermediary system, or another source.

164. Defendant's failure to identify the source of the information deprived Plaintiff of the ability to determine who created, transmitted, modified, suppressed, or displayed the information.

165. Defendant's failure to disclose the source information impaired Plaintiff's ability to investigate, verify, and dispute the information effectively.

**F. Defendant Had Notice of the Inaccuracies Through Plaintiff's Disputes**

166. Plaintiff disputed information in his consumer file with Defendant prior to the issuance of the Consumer File Disclosure.

167. The Consumer File Disclosure reflects that Defendant received and processed disputes submitted by Plaintiff.

168. The tradeline identified as PORTFOLIO RECOVERY ASSOCIATES, opened April 13, 2024, bears the notation that Defendant completed an investigation of an FCRA dispute and that the consumer disagrees.

169. The tradeline identified as PORTFOLIO RECOVERY ASSOCIATES, opened April 13, 2024, bears a consumer statement reflecting that the item is in dispute by the consumer.

170. The tradeline identified as MIDLAND CREDIT MANAGEMEN bears the notation that the account information was disputed by the consumer.

171. The Consumer File Disclosure bears multiple additional notations reflecting that items in Plaintiff's consumer file were disputed by the consumer.

172. Defendant therefore had notice that information in Plaintiff's consumer file was the subject of consumer dispute.

173. Notwithstanding that notice, Defendant continued to maintain and report the inaccuracies described in this Complaint.

**F-1. Plaintiff Suffered Credit-Related Harm**

174. During the period in which Defendant maintained and disseminated the inaccurate and materially misleading information described in this Complaint, Plaintiff applied for and sought various forms of consumer credit and financing.

175. Plaintiff was denied credit that he otherwise sought to obtain.

176. Plaintiff was granted credit on less favorable terms than he otherwise would have obtained.

177. Plaintiff was charged higher interest rates than he otherwise would have been charged.

178. Plaintiff received lower credit limits than he otherwise would have received.

179. Plaintiff lost credit opportunities.

180. Plaintiff was unable to obtain financing that he otherwise would have obtained.

181. Plaintiff experienced adverse consequences in connection with housing opportunities.

182. Plaintiff experienced adverse consequences in connection with insurance opportunities.

183. Plaintiff experienced adverse consequences in connection with employment opportunities.

184. Plaintiff reasonably believes that the inaccurate and materially misleading information maintained and disseminated by Defendant was a substantial factor contributing to those adverse consequences.

185. The precise recipients of Defendant's consumer reports, the contents of the reports furnished, the dates of dissemination, and the extent to which those reports were relied upon are uniquely within Defendant's possession, custody, and control and will be the subject of discovery.

**G. Dissemination and Notice**

186. Defendant prepared and assembled Plaintiff's consumer file and consumer reports containing the inaccuracies described in this Complaint.

187. Upon information and belief, Defendant disseminated consumer reports concerning Plaintiff to third parties during the period in which the inaccuracies described in this Complaint were present in Plaintiff's consumer file.

188. Upon information and belief, one or more consumer reports furnished by Defendant during that period contained the inaccurate and materially misleading information described in this Complaint.

189. Defendant's conduct as described in this Complaint was consistent across numerous tradelines and reflects a systemic practice rather than an isolated error.

190. Defendant had actual knowledge of the Metro 2 Format and of its statutory accuracy obligations at all times relevant to this Complaint.

191. Defendant acted in reckless disregard of its statutory obligations under the Fair Credit Reporting Act and Article 25 of the New York General Business Law.

192. Defendant has possessed actual knowledge of Metro 2 reporting requirements for many years.

193. Defendant expressly acknowledged those requirements in the multistate Attorneys General Settlement Agreement and Assurance of Voluntary Compliance.

194. Despite that knowledge, Defendant continued to disclose and disseminate tradelines displaying dash balance fields in circumstances where Metro 2 requires a current balance of zero ($0).


Doc ID: ca5df5346776c37722b351678e9a1f6aecaf3538

195. Defendant's conduct reflects a systemic reporting practice affecting numerous tradelines rather than an isolated clerical error.

196. Defendant acted knowingly or in reckless disregard of the rights secured to consumers by the Fair Credit Reporting Act.

## FIRST CAUSE OF ACTION

### Violation of 15 U.S.C. section 1681e(b)

197. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

198. Defendant is a consumer reporting agency subject to 15 U.S.C. section 1681e(b).

199. Defendant prepared consumer reports concerning Plaintiff.

200. Defendant was required to follow reasonable procedures to assure maximum possible accuracy of the information in Plaintiff's consumer reports.

201. Defendant reported Plaintiff's paid and closed accounts with a blank current balance field rather than a current balance of zero ($0).

202. Defendant's reporting of a blank current balance on paid and closed accounts was inaccurate or materially misleading.

203. Defendant failed to follow reasonable procedures to assure maximum possible accuracy of the current balance field on Plaintiff's paid and closed accounts.

204. Defendant's inconsistent treatment of the current balance field across closed accounts in a single Consumer File Disclosure demonstrates the absence of reasonable procedures.

205. Defendant's failure to reconcile the paid and closed account status against the current balance field demonstrates the absence of reasonable procedures.

206. Defendant's conduct violated 15 U.S.C. section 1681e(b).

207. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered injury and damages as set forth herein.

## SECOND CAUSE OF ACTION

### Violation of 15 U.S.C. section 1681g(a)(1)

208. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

209. Plaintiff requested disclosure of his consumer file from Defendant.

210. Defendant was required to clearly and accurately disclose to Plaintiff all information in Plaintiff's consumer file at the time of the request.

211. Upon information and belief, Defendant maintained in Plaintiff's consumer file payment history information that Defendant failed to disclose in the Consumer File Disclosure.

212. Upon information and belief, Defendant maintained in Plaintiff's consumer file a current balance value for one or more paid and closed accounts that differed from the dash reported in the Consumer File Disclosure.

213. In the alternative, if Defendant contends that the dash symbols shown in the Consumer File Disclosure were not substitutes for undisclosed underlying values, then Defendant failed to clearly and accurately disclose the meaning of those symbols and failed

to disclose information in a manner that permitted Plaintiff to understand, verify, and dispute the contents of his file.

214. In the alternative, if Defendant contends that no additional payment-history information existed for the period preceding the displayed history, Defendant failed to clearly disclose that fact and failed to disclose the reason for the apparent omission of historical account information.

215. Regardless of whether Defendant maintained undisclosed underlying values or instead failed to clearly explain the information displayed, the Consumer File Disclosure did not permit Plaintiff to determine the actual information maintained in his file concerning the affected tradelines.

216. To the extent Defendant maintained information in Plaintiff's consumer file that it failed to disclose in the Consumer File Disclosure, Defendant failed to clearly and accurately disclose all information in Plaintiff's consumer file.

217. Defendant's conduct violated 15 U.S.C. section 1681g(a)(1).

218. As a direct and proximate result of Defendant's conduct, Plaintiff was deprived of information to which he was statutorily entitled and has suffered injury and damages as set forth herein.

## THIRD CAUSE OF ACTION

### Violation of 15 U.S.C. § 1681g(a)(2)

219. Plaintiff repeats and realleges each preceding paragraph as though fully set forth herein.

220. Plaintiff requested disclosure of his consumer file from Defendant.


Doc ID: ca5df5346776c37722b351678e9a1f6aecaf3538

221. Defendant was required to clearly and accurately disclose the sources of the information contained in Plaintiff's consumer file.

222. Defendant failed to clearly and accurately disclose the source or sources of the dash balance fields appearing on paid, closed, and settled accounts.

223. Defendant failed to disclose whether the dash balance fields originated from furnishers, Defendant's own internal systems, Defendant's own formatting logic, Defendant's own suppression rules, intermediary vendors, or other sources.

224. Defendant failed to disclose source information sufficient to permit Plaintiff to determine who created, transmitted, modified, stored, mapped, suppressed, or displayed the information at issue.

225. Defendant's failure deprived Plaintiff of information necessary to understand, verify, investigate, and dispute the information maintained in his consumer file.

226. Defendant's conduct violated 15 U.S.C. § 1681g(a)(2).

227. As a direct and proximate result of Defendant's conduct, Plaintiff suffered informational injury, time loss, frustration, anxiety, uncertainty, out-of-pocket expenses, and other damages.

## FOURTH CAUSE OF ACTION

### Violation of New York General Business Law section 380-j(e)

228. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.


Doc ID: ca5df5346776c37722b351678e9a1f6aecaf3538

229. Defendant is a consumer reporting agency subject to Article 25 of the New York General Business Law.

230. Defendant was required to follow reasonable procedures to assure maximum possible accuracy of the information in Plaintiff's consumer reports under GBL section 380-j(e).

231. Defendant failed to follow reasonable procedures to assure maximum possible accuracy as described in this Complaint.

232. Defendant's conduct violated GBL section 380-j(e).

233. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered injury and damages as set forth herein.

## FIFTH CAUSE OF ACTION

**Violation of New York General Business Law section 349 (pleaded in the alternative)**

234. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

235. Defendant's business of assembling and selling consumer reports is consumer-oriented conduct.

236. Defendant's conduct in disseminating consumer reports has a broad impact on consumers at large.

237. Defendant's reporting of paid and closed accounts with a blank current balance is a materially misleading act or practice directed at the consuming public.


Doc ID: ca5df5346776c37722b351678e9a1f6aecaf3538

238. Defendant engaged in the conduct described in this Complaint knowingly and with willful intent to injure consumers, including Plaintiff, or in reckless disregard of consumers' rights.

239. Defendant's conduct was a deceptive act or practice in the conduct of business within the State of New York.

240. Plaintiff was injured by reason of Defendant's deceptive act or practice.

241. Defendant's conduct violated GBL section 349.

**WILLFUL AND NEGLIGENT NONCOMPLIANCE**

242. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

243. Defendant's violations of the Fair Credit Reporting Act were willful within the meaning of 15 U.S.C. section 1681n.

244. In the alternative, Defendant's violations of the Fair Credit Reporting Act were negligent within the meaning of 15 U.S.C. section 1681o.

245. Defendant's violations of Article 25 of the New York General Business Law were willful within the meaning of GBL section 380-l.

246. In the alternative, Defendant's violations of Article 25 of the New York General Business Law were negligent within the meaning of GBL section 380-m.

247. Defendant's interpretation of its obligations was objectively unreasonable because the Fair Credit Reporting Act expressly requires clear and accurate disclosure of all information in the consumer's file and the sources of that information.


Doc ID: ca5df5346776c37722b351678e9a1f6aecaf3538

248. Defendant's interpretation was objectively unreasonable because the CFPB's January 23, 2024 Advisory Opinion placed Defendant on notice that file disclosures must include information the consumer reporting agency provides, could provide, or might provide to users.

249. Defendant's interpretation was objectively unreasonable because the CFPB's January 23, 2024 Advisory Opinion placed Defendant on notice that source disclosures must include original, intermediary, and vendor sources.

250. Defendant's interpretation was objectively unreasonable because Metro 2 standards require paid, closed, and final-status accounts to carry a zero balance.

251. Defendant's conduct was objectively unreasonable because Defendant disclosed a zero balance for certain closed accounts while disclosing dash balances for other paid, closed, and settled accounts in the same Consumer File Disclosure.

252. Defendant's conduct was objectively unreasonable because Defendant possessed all information necessary to detect the inconsistency before furnishing consumer reports or issuing the Consumer File Disclosure.

253. Defendant's conduct was objectively unreasonable because the defect was repeated across numerous tradelines.

254. Defendant's conduct was objectively unreasonable because a consumer reporting agency of Defendant's size, sophistication, regulatory history, and technical capability can readily implement automated procedures to prevent a paid, closed, or settled account from being displayed with an unexplained dash in the current balance field.

255. Defendant knowingly adopted, maintained, or tolerated systems and procedures that produced unclear, incomplete, internally inconsistent, and materially misleading file disclosures and consumer reports.

256. Defendant's conduct presents a substantial risk of repeated consumer harm because the same display, mapping, validation, and disclosure practices used on Plaintiff's file are capable of affecting other New York consumers whose paid, closed, or settled accounts are disclosed or furnished with unclear dash balance fields instead of affirmative zero ($0) balances.

257. Upon information and belief, the reporting, display, mapping, validation, suppression, and disclosure practices described herein are not unique to Plaintiff's file and are capable of affecting numerous other consumers whose files contain paid, closed, charged-off, or settled accounts reported through the same systems and procedures.

## INJURY AND DAMAGES

258. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered the injuries and damages set forth in the following paragraphs.

259. Plaintiff suffered informational injury in that he was deprived of accurate and complete information to which he was statutorily entitled.

260. Plaintiff personally reviewed the Consumer File Disclosure.

261. Plaintiff was unable to determine the true contents of his file because Defendant failed to disclose the meaning of the dash balance fields and failed to disclose complete historical account information.

262. Plaintiff expended time and effort attempting to understand, verify, investigate, and correct the information maintained by Defendant.

263. Plaintiff suffered frustration, anxiety, concern, uncertainty, and loss of sleep arising from Defendant's conduct.

264. Plaintiff did not merely receive information in an inconvenient format.

265. Plaintiff was deprived of information necessary to understand the actual contents of his file, including the meaning, source, and underlying value of numerous dash balance fields.

266. Plaintiff was deprived of information necessary to determine whether paid, closed, and settled accounts were being reported with zero balances or with missing, unknown, suppressed, or unresolved balance information.

267. Plaintiff was deprived of information necessary to determine whether Defendant was furnishing the same unclear and misleading balance information to third parties.

268. Plaintiff was deprived of information necessary to determine which furnisher, vendor, intermediary, database, or Experian process caused the inaccurate or incomplete information.

269. Plaintiff personally reviewed the Consumer File Disclosure and was confused, concerned, frustrated, and anxious because Defendant's disclosure did not clearly reveal the true current-balance information maintained in his file.

270. Plaintiff spent time reviewing the disclosure, identifying affected tradelines, investigating the meaning of the dash balance fields, and attempting to determine whether the affected accounts reflected any current balance.

271. Upon information and belief, Defendant disseminated inaccurate and materially misleading consumer reports concerning Plaintiff to third parties, including one or more entities identified in the hard inquiry section of the Consumer File Disclosure, and those disseminations were a substantial factor in causing the adverse consequences described herein.

272. Plaintiff suffered harm to his reputation and to his creditworthiness.

273. Plaintiff was denied credit.

274. Plaintiff was granted credit on less favorable terms than he would otherwise have obtained.

275. Plaintiff was charged higher interest rates than he would otherwise have been charged.

276. Plaintiff received reduced credit limits than he would otherwise have obtained.

277. Plaintiff lost credit opportunities.

278. Plaintiff was unable to obtain financing that he would otherwise have obtained.

279. Plaintiff expended time and effort disputing the inaccurate information and attempting to correct his consumer file.

280. Plaintiff incurred out-of-pocket expenses, including expenses for postage, certified mail, and copying, in disputing the inaccurate information.

281. Plaintiff suffered emotional distress, including anxiety, worry, frustration, embarrassment, humiliation, and mental anguish.

282. Plaintiff suffered loss of sleep.

283. Plaintiff suffered an adverse impact on his ability to obtain housing.

284. Plaintiff suffered an adverse impact on his ability to obtain insurance.

285. Plaintiff suffered an adverse impact on his ability to obtain or maintain employment.

286. Plaintiff suffered the continuing risk that the inaccurate information would be further disseminated and relied upon to his detriment.

287. Plaintiff is entitled to actual damages in an amount to be determined at trial.

288. Plaintiff is entitled to statutory damages of not less than one hundred dollars and not more than one thousand dollars for each willful violation of the Fair Credit Reporting Act pursuant to 15 U.S.C. section 1681n(a)(1)(A).

289. Plaintiff is entitled to punitive damages for Defendant's willful violations pursuant to 15 U.S.C. section 1681n(a)(2).

290. Plaintiff is entitled to reasonable attorney's fees and costs pursuant to 15 U.S.C. sections 1681n and 1681o and GBL sections 380-l and 380-m.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Adam Shrem respectfully requests that this Court enter judgment in his favor and against Defendant Experian Information Solutions, Inc. as follows:

(a) Awarding Plaintiff actual damages in an amount to be determined at trial;

(b) Awarding Plaintiff statutory damages pursuant to 15 U.S.C. section 1681n(a)(1)(A);

(c) Awarding Plaintiff punitive damages pursuant to 15 U.S.C. section 1681n(a)(2);

(d) Awarding Plaintiff damages pursuant to GBL sections 380-l and 380-m;

(e) Awarding Plaintiff the damages available under GBL section 349, including, where applicable, treble damages pursuant to GBL section 349(h);

(f) Awarding Plaintiff reasonable attorney's fees and costs;

(g) Awarding Plaintiff pre-judgment and post-judgment interest as permitted by law; and

(h) Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: Brooklyn, New York
June 17, 2026

**THE LAW OFFICE OF ELLIOT M. ELO, ESQ. PLLC**

By: s/ Elliot M. Elo
Elliot M. Elo, Esq.
42 West 48th Street, Floor 2
New York, New York 10036-1701
Telephone: (212) 302-1257
Facsimile: (212) 302-1648
Email: elliot@elolawfirm.com
*Attorney for Plaintiff*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

-----------------------------------------------------------------------X
ADAM SHREM,

Index No. _______________ / 2026

Plaintiff,

**VERIFICATION**

-against-

EXPERIAN INFORMATION SOLUTIONS, INC.,

Defendant.

-----------------------------------------------------------------------X

I, ADAM SHREM, affirm the following under the penalties of perjury and the laws of the State of New York:

I am the Plaintiff in the above-captioned action.

I have read the foregoing Verified Complaint and know the contents thereof.

The contents of the Verified Complaint are true to my own knowledge, except as to those matters alleged upon information and belief, and as to those matters I believe them to be true.

Dated: June 17, 2026

______________________________
ADAM SHREM



Doc ID: ca5df5346776c37722b351678e9a1f6aecaf3538

Case 1:26-cv-04317-BMC Document 1-1 Filed 07/17/26 Page 40 of 85 PageID #: 43

## EXHIBIT INDEX

The following exhibits are annexed to this Verified Complaint and are incorporated herein by reference to the extent relevant to the allegations asserted.

**Exhibit A**: Tradeline Defect Summary Chart, identifying representative paid, closed, and settled tradelines disclosed with dash balance fields rather than affirmative zero ($0) current balances.

**Exhibit B**: Excerpts from the 2024 Credit Reporting Resource Guide concerning Metro 2 Account Status Code 13 and zero-balance treatment for paid or closed accounts.

**Exhibit C**: Excerpts from the 2024 Credit Reporting Resource Guide concerning final account status reporting, paid-settlement reporting, and Metro 2 requirements that paid, closed, and settled accounts be reported with a zero ($0) current balance.

**Exhibit D**: Excerpts from the CFPB January 23, 2024 Advisory Opinion concerning FCRA § 1681g(a), file-disclosure obligations, disclosure of all information in the consumer's file, and disclosure of source information.

**Exhibit E**: Selected excerpts from the 2015 Settlement Agreement and Assurance of Voluntary Compliance reflecting Defendant's notice of FCRA accuracy obligations, maximum possible accuracy requirements, Metro 2 reporting standards, furnisher-monitoring obligations, and regulatory notice supporting willfulness and reckless disregard.

**Exhibit F**: Hard Inquiry Summary Chart identifying the hard inquiries reflected in the Consumer File Disclosure and supporting Plaintiff's allegations that third parties requested or obtained consumer reports concerning Plaintiff from Defendant.


Doc ID: ca5df5346776c37722b351678e9a1f6aecaf3538

Dropbox Sign

Audit trail

| | |
|---|---|
| **Title** | Shrem_v_Experian_Verified_Complaint_1.pdf |
| **File name** | Shrem_v_Experian_...d_Complaint_1.pdf |
| **Document ID** | ca5df5346776c37722b351678e9a1f6aecaf3538 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | Signed |

**This document was requested from app.clio.com**

## Document History

| | | |
|---|---|---|
| SENT | **06 / 17 / 2026** 22:21:43 UTC | Sent for signature to Adam Shrem (theshrems@aol.com) by services@clio.com acting on behalf of info@elolawfirm.com IP: 69.115.179.180 |
| VIEWED | **06 / 17 / 2026** 22:22:51 UTC | Viewed by Adam Shrem (theshrems@aol.com) IP: 172.56.166.111 |
| SIGNED | **06 / 17 / 2026** 22:23:09 UTC | Signed by Adam Shrem (theshrems@aol.com) IP: 172.56.166.111 |
| COMPLETED | **06 / 17 / 2026** 22:23:09 UTC | The document has been completed. |

# Exhibit A

**EXHIBIT A**

**TRADELINE DEFECT SUMMARY CHART**

This chart summarizes representative tradelines from Plaintiff's April 28, 2026 Consumer File Disclosure. Plaintiff does not publicly file the complete Consumer File Disclosure because it contains sensitive personal identifying information and private financial data.

| No. | Tradeline | Date Opened | Status Shown | Current Balance Shown | Alleged Defect |
|---|---|---|---|---|---|
| 1 | ADS/COMENITY/C21 | October 9, 2016 | Paid and closed | Dash | Paid or closed account should disclose an affirmative $0 current balance |
| 2 | ADS/COMENITY/NY&CO | May 8, 2015 | Paid and closed | Dash | Paid or closed account should disclose an affirmative $0 current balance |
| 3 | AFFINITY FCU | November 22, 2016 | Paid and closed | Dash | Paid or closed account should disclose an affirmative $0 current balance |
| 4 | BANK OF AMERICA | September 14, 2018 | Paid and closed | Dash | Paid or closed account should disclose an affirmative $0 current balance |
| 5 | BARCLAYS BANK DELAWARE | November 20, 2011 | Paid and closed | Dash | Paid or closed account should disclose an affirmative $0 current balance |
| 6 | CAP1/L&T | January 18, 2013 | Paid and closed | Dash | Paid or closed account should disclose an affirmative $0 current balance |

| No. | Tradeline | Date Opened | Status Shown | Current Balance Shown | Alleged Defect |
|---|---|---|---|---|---|
| 7 | CAPITAL ONE | July 28, 2007 | Paid and closed | Dash | Paid or closed account should disclose an affirmative $0 current balance |
| 8 | CITI CARDS/CITIBANK | August 9, 2017 | Paid and closed | Dash | Paid or closed account should disclose an affirmative $0 current balance |
| 9 | COMENITY BANK/PIER 1 | August 28, 2009 | Paid and closed | Dash | Paid or closed account should disclose an affirmative $0 current balance |
| 10 | SYNCB/HOME | June 21, 2015 | Paid and closed | Dash | Paid or closed account should disclose an affirmative $0 current balance |
| 11 | AMERICAN EXPRESS | September 30, 1996 | Paid and closed | Dash | Paid or closed account should disclose an affirmative $0 current balance |
| 12 | AMERICAN EXPRESS | February 10, 2019 | Paid in settlement | Dash | Settled account should clearly disclose whether any current balance remains |
| 13 | CITI TY MC/CBNA | January 1, 2009 | Account history disclosed beginning in 2014 | Not applicable | Disclosure does not show payment history from 2009 through first displayed history period |

Plaintiff reserves the right to supplement this chart after discovery, including after Defendant produces archived report images, report-output records, Metro 2 data fields, source records, and complete consumer-file data.

# Exhibit B

# 2024 Credit Reporting Resource Guide®


*Copyright 2024 © Consumer Data Industry Association*

## Retail Accounts (store exclusive)

While all applicable fields within the Metro 2® Format should be reported, these guidelines provide specific values that apply to Retail accounts.

| Field | Segment/ Field # | | |
|---|---|---|---|
| Portfolio Type | Base/8 | R (Revolving) | I (Installment) |
| Account Type | Base/9 | 07 | 06 |
| Credit Limit | Base/11 | Assigned credit limit | Zero fill |
| Highest Credit/Original Loan Amount | Base/12 | Highest amount of credit utilized by the consumer | Original amount of the loan, excluding interest payments |
| Terms Duration | Base/13 | Constant of 'REV' | Number of months of the loan |
| Scheduled Monthly Payment Amount | Base/15 | Minimum amount due based on the balance, not including any amounts past due | Regular monthly payment |
| Account Status | Base/17A | 11, 13, 62, 64, 71, 78, 80, 82–84, 93, 97, DA, DF<br>**Notes:** As per the status definitions in Exhibit 4, Account Status 13 (Paid or closed account/zero balance) is a final status. When reported for Revolving portfolio types, the account should no longer be available for use and the Balance Amount should be zero.<br><br>If the account has a zero balance but is still open for further use, report Account Status Code 11 (current). | 11, 13, 61 – 64, 71, 78, 80, 82 – 84, 93, 95 – 97, DA, DF |
| Special Comment | Base/19 | Closed accounts = M, AP, BL, CI<br>Legal Action = AM<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AO, AU, AX, BP, BT, CP<br>Transferred = O, AN, AT, BA<br>Other = S, V, AV, AW, AZ, CH<br>Removal of comment = blank | Closed accounts = I<br>Legal Action = AM<br>Refinanced = AS<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AO, AU, AX, BP, BT, CP<br>Transferred = O, AT, BA<br>Other = S, V, AV, AW, AZ, CH<br>Removal of comment = blank |
| Comp. Cond. Code | Base/20 | XA – XJ, XR | XB, XC, XF, XG, XH, XR |
| Date Closed | Base/26 | Date closed to further purchases/use | Date paid in full |
| ECOA Code | Base/37<br>J1 & J2/10 | ECOA Codes 5 and 7 are not applicable. | ECOA Code 3 is not applicable. |


*Copyright 2024 © Consumer Data Industry Association*
Return to Table of Contents

# Exhibit C

# 2024 Credit Reporting Resource Guide®


*Copyright 2024 © Consumer Data Industry Association*

# Exhibit 6

## Special Comment Codes - By Category within Portfolio Type

| Category | Description | Line of Credit | Install-ment | Mortgage | Open | Revolving |
|---|---|---|---|---|---|---|
| Special Payment Arrangements (continued) | Account Paid in Full for Less than the Full Balance<br>(Requires Account Status Code 13 or 61-65 and Current Balance = 0. Refer to Frequently Asked Questions 38 and 53 for reporting guidelines.)<br>*Definition: To be used when the furnisher accepts payment in full for less than the full balance. Includes short sales.* | AU | AU | AU | AU | AU |
| | Account Paid from Collateral<br>(Requires Account Status Code 13 or 61-65 and Current Balance = 0) | AX | AX | - | - | AX |
| | Paid by Company which Originally Sold the Merchandise<br>(Requires Account Status Code 13 or 61-65 and Current Balance = 0) | - | BN | - | - | - |
| | Paid through Insurance<br>(Requires Account Status Code 13 or 61-65 and Current Balance = 0) | BP | BP | BP | BP | BP |
| | Principal Deferred/Interest Payment Only | BT | BT | BT | - | BT |
| | Account in Forbearance<br>(Account Status Code should ***not*** be 13 or 61-65 and Current Balance should ***not*** be zero.) | CP | CP | CP | CP | CP |

(continued)


*Copyright 2024 © Consumer Data Industry Association*

Return to Table of Contents

# Exhibit D

**BILLING CODE: 4810-AM-P**

**CONSUMER FINANCIAL PROTECTION BUREAU**

**12 CFR Part 1022**

**Fair Credit Reporting; File Disclosure**

**AGENCY:** Consumer Financial Protection Bureau.

**ACTION:** Advisory opinion.

**SUMMARY:** The Consumer Financial Protection Bureau (CFPB or Bureau) is issuing this advisory opinion to address certain obligations that consumer reporting agencies have under section 609(a) of the Fair Credit Reporting Act (FCRA). This advisory opinion underscores that, to trigger a consumer reporting agency's file disclosure requirement under FCRA section 609(a), a consumer does not need to use specific language, such as "complete file" or "file." This advisory opinion also highlights the requirements regarding the information that must be disclosed to a consumer under FCRA section 609(a). In addition, this advisory opinion affirms that consumer reporting agencies must disclose to a consumer both the original source and any intermediary or vendor source (or sources) that provide the item of information to the consumer reporting agency under FCRA section 609(a).

**DATES:** This advisory opinion is effective on [INSERT DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].

**FOR FURTHER INFORMATION CONTACT:** Amanda Quester, Alexandra Reimelt, or Ruth Van Veldhuizen, Senior Counsels, Office of Regulations at (202) 435-7700 or https://reginquiries.consumerfinance.gov/. If you require this document in an alternative electronic format, please contact *CFPB_Accessibility@cfpb.gov*.

**SUPPLEMENTARY INFORMATION:** The Bureau is issuing this advisory opinion through

the procedures for its Advisory Opinions Policy.[1] Refer to those procedures for more information.

**I. Advisory Opinion**

*A. Background*

The FCRA regulates consumer reporting.[2] Congress enacted the statute "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy."[3] One of the problems with the credit reporting industry that Congress recognized and sought to remedy with the FCRA was that a consumer "is not always given access to the information in [their] file."[4] In light of its broad remedial and consumer protection purposes, courts have recognized that the FCRA "must be read in a liberal manner in order to effectuate the congressional intent underlying it."[5]

The FCRA also promotes transparency of the credit reporting system to consumers in many ways, including by generally requiring that consumer reporting agencies disclose to consumers all information in their file upon request. Under section 609(a), a consumer reporting agency must, upon request, clearly and accurately disclose to the consumer "[a]ll information in

[1] 85 FR 77987 (Dec. 3, 2020).
[2] *See* 15 U.S.C. 1681-1681x.
[3] *Safeco Ins. Co. of Am. v. Barr*, 551 U.S. 47, 52 (2007); *see also* 15 U.S.C. 1681 (recognizing "a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy"); S. Rep. No. 91-517, at 1 (1969) (noting that purpose of the statute is, in part, to "prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report" and to "prevent an undue invasion of the individual's right of privacy in the collection and dissemination of credit information").
[4] S. Rep. No. 91-517, at 3 (1969) (noting, as an example of this problem, that "[i]nsurance reporting firms generally do not admit to making a report on an individual and ordinarily will not reveal the contents of their file to [them]. Credit bureaus sometimes build roadblocks in the path of the consumer."). When introducing the bill that would become the FCRA, Senator Proxmire stated that "[m]any credit reporting agencies refuse to show consumers their files possibly out of fear of litigation and partly to protect its information sources." 115 Cong. Rec. 2412 (1969).
[5] *See*, *e.g.*, Fed. Trade Comm'n, *40 Years of Experience With the Fair Credit Reporting Act: An FTC Staff Report With Summary of Interpretations*, at 32 (2011); *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3rd Cir. 2010); *Guimond v. Trans Union Credit Info. Co*., 45 F.3d 1329, 1333 (9th Cir. 1995) ("[The FCRA] was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner. These consumer[-]oriented objectives support a liberal construction of the FCRA" (citations omitted).).

the consumer's file at the time of the request" and "[t]he sources of the information."[6] This requirement applies to all consumer reporting agencies.[7] Consumers are entitled to free file disclosures in many circumstances. For example, each nationwide consumer reporting agency and nationwide specialty consumer reporting agency, including any nationwide tenant screening or employment background screening company, must provide at least one free file disclosure annually.[8] Consumers also are entitled to free file disclosures in certain other circumstances, such as in connection with adverse action notices and fraud alerts.[9]

The FCRA defines a consumer's "file" as "all of the information on that consumer that is recorded and retained by a consumer reporting agency, regardless of how the information is stored."[10] Consumer reporting agencies possess files on hundreds of millions of Americans. These files typically include information about, among other things, a consumer's credit, criminal, employment, and rental histories. Consumer reporting agencies may obtain this information from multiple sources, including companies that provide information about their direct experiences with consumers and third parties who gather information from courts and

---

[6] *See* 15 U.S.C. 1681g(a). This requirement is subject to several exceptions. For example, consumer reporting agencies are not required to disclose to a consumer any information concerning credit scores or any other risk scores or predictors relating to the consumer. *See* 15 U.S.C. 1681g(a)(1)(B). The Consumer Credit Reporting Reform Act of 1996 revised FCRA section 609(a) to require that consumers receive all information in the file rather than only the "nature and substance" of the information. Pub. L. 104-208, 110 Stat. 3009 (1996).
[7] *See* 15 U.S.C. 1681a(f) (defining "consumer reporting agency").
[8] *See* 15 U.S.C. 1681j; 12 CFR 1022.136 (centralized source for requesting annual file disclosures from nationwide consumer reporting agencies); 12 CFR 1022.137 (streamlined process for requesting annual file disclosures from nationwide specialty consumer reporting agencies); CFPB, *Bulletin 2012-09* (Nov. 29, 2012) (explaining FCRA's "streamlined process" requirement for consumers to obtain free annual reports from nationwide specialty consumer reporting agencies), https://www.consumerfinance.gov/compliance/supervisory-guidance/bulletin-fcra-process-requirement-consumers/.
[9] *See* 15 U.S.C. 1681j(b)-(d). In other instances, consumers may be required to pay for a file disclosure, with the fee capped by regulation. A list of consumer reporting companies is available at: https://www.consumerfinance.gov/consumer-tools/credit-reports-and-scores/consumer-reporting-companies/companies-list/.
[10] *See* 15 U.S.C. 1681a(g) (defining "file").

other sources of public records.[11] Errors by a furnisher or a third-party source can affect a consumer's file at many different consumer reporting agencies.[12] Consumer reporting agencies use the information in consumer files to produce and sell consumer reports,[13] which creditors, insurers, landlords, employers, and others who have a permissible purpose use to make eligibility and other decisions about consumers. The potential for the vast quantity of information contained in consumer files to include errors poses significant risks to accuracy, fairness, and consumer privacy in the consumer reporting system.

Section 609(a)'s file disclosure requirements are central to the statute's accuracy, fairness, and privacy purposes. Consumers have a right to see the information consumer reporting agencies keep about them in their files at any time. Absent file disclosure requirements, a consumer may not be able to review their file, determine whether it contains any incomplete or inaccurate information, and, if it does, file a dispute under FCRA sections 611 and 623, and have the information corrected or deleted.[14] Disclosure of the information in a consumer's file upon request is a critical component of the FCRA's carefully calibrated dispute provisions.[15] Moreover, file disclosure also promotes the FCRA's fairness purpose by enabling

---

[11] CFPB, Market Snapshot: Background Screening Reports: Criminal background checks in employment 5-6 (Oct. 2019), https://files.consumerfinance.gov/f/documents/201909_cfpb_market-snapshot-background-screening_report.pdf. *See also* Nat'l Consumer Law Ctr., *Broken Records: How Errors by Criminal Background Checking Companies Harm Workers and Business* 10-11 (2012), *https://www.nclc.org/images/pdf/pr-reports/broken-records-report.pdf*.

[12] *See, e.g.*, *Clark v. Trans Union LLC*, No. 3:15cv391, 2016 WL 7197391, at *11 (E.D. Va. Dec. 9, 2016) (stating that "the failure to include LexisNexis in the report creates a material risk that LexisNexis could continue to report inaccurate information to others in the future").

[13] *See* 15 U.S.C. 1681a(d) (defining "consumer report").

[14] *See* 15 U.S.C. 1681i.

[15] *See*, *e.g.*, *Gillespie v. Equifax Info. Servs., LLC*, 484 F.3d 938, 941 (7th Cir. 2007) (stating that "a primary purposes of the statutory scheme provided by the disclosure in § 1681g(a)(1) is to allow consumers to identify inaccurate information in their credit files and correct this information via the grievance procedure established under § 1681i"). In addition, the Bureau has previously emphasized the importance of consumer reporting agencies using disputes to assess furnisher data quality. For example, the Bureau has directed consumer reporting agencies to revise their accuracy procedures to identify and take corrective action regarding data from furnishers whose dispute response behavior indicates the furnisher is not a source of reliable, verifiable information about consumers. *See* CFPB, *Supervisory Highlights:* Issue 24, Summer 2021 (June 2021), https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-24_2021-06.pdf.

consumers to identify any negative information in their files that may be used to make credit and other eligibility determinations about them and take steps to improve their credit profiles.[16]

Consumers may suffer significant harm when they are unable to obtain all information in their files upon request. Without access to all information in their file, a consumer often cannot even take the initial steps to dispute inaccurate information in their consumer reports or take well-informed action to improve their credit profile. Disputing inaccurate information on a consumer report and improving one's credit profile, often challenging and time-consuming processes for consumers, are made even more difficult when consumers do not have access to all of the information in their file. For example, if a consumer identifies an error in an item of information in their file, but the consumer reporting agency has only disclosed to the consumer the original source of the information and not also the vendor source that directly provided the information to the consumer reporting agency and from which the error arose, the consumer would not be able to identify the source of the erroneous information and may not be able to correct it.[17]

The CFPB is issuing this advisory opinion to highlight certain file disclosure requirements imposed under FCRA section 609(a). First, this advisory opinion underscores that, to trigger a consumer reporting agency's file disclosure requirement under FCRA section 609(a),

---

[16] The FTC and the CFPB have brought several enforcement actions to address violations of the FCRA's file disclosure requirements. *See, e.g.*, *FTC v. TransUnion Rental Screening Solutions, Inc.*, No. 1:23-cv-2659 (D. Colo. 2023) (alleging that defendant violated FCRA section 609(a) by failing to disclose the sources of information contained in consumers' files in response to consumers' requests); *United States v. HireRight Solutions, Inc.*, No. 112-cv-01313 (D.D.C. 2012) (alleging that defendant violated FCRA section 609(a)(1) by either failing to provide consumers with information in their files or failing to do so upon request); *United States v. First Advantage SafeRent, Inc.*, No. 8:10-cv-0090-PJM (D. Md. 2010) (alleging that defendant violated FCRA section 609(a)(1) by rejecting requests for file disclosure submitted by facsimile and requiring consumers complete and submit a written file disclosure request form through the U.S. mail); *In re MIB, Inc.* (*d/b/a Medical Information Bureau)*, 101 F.T.C. 415 (1983) (alleging that defendant violated FCRA section 609(a) when it required consumer to sign a release form as a prerequisite for obtaining their file disclosure).

[17] *See Leo v. AppFolio, Inc.*, No. 17-5771 RJB, 2018 WL 623647, at *8 (W.D. Wash. Jan. 30, 2018).

a consumer does not need to use specific language, such as "complete file" or "file." Next, this advisory opinion highlights the requirements regarding the information that must be disclosed to a consumer under FCRA section 609(a). Finally, this advisory opinion affirms that consumer reporting agencies must disclose to a consumer both the original source and any intermediary or vendor source (or sources) that provide the item of information to the consumer reporting agency under FCRA section 609(a).

*B. Coverage*

This advisory opinion applies to all "consumer reporting agencies," as that term is defined in FCRA section 603(f).

*C. Legal Analysis*

1. *Requests under FCRA Section 609(a)*

Section 609(a) of the FCRA provides, with certain exceptions, that "[e]very consumer reporting agency shall, upon request . . . clearly and accurately disclose to the consumer, among other things: (1) All information in the consumer's file at the time of the request . . .; and (2) The sources of the information." Section 610 in turn specifies the conditions and form of disclosures to consumers. The Bureau is aware that some industry stakeholders have taken the position that consumers must use specific language in order to request file disclosures under section 609(a), such as the term "complete file."[18] As the Third Circuit recently held, such requirements

[18] *See, e.g.,* Brief of the Chamber of Commerce of the United States as *Amicus Curiae* in Support of Appellees, *Kelly v. RealPage, Inc.*, No. 21-1672 (Aug. 5, 2021), https://www.chamberlitigation.com/cases/kelly-v-realpage-inc at 5, 28-29 (arguing that to trigger the requirements of FCRA section 609(a) "the request must specifically be for '[a]ll information in the consumer's file,' meaning the complete file"); Brief of *Amici Curiae* Consumer Data Industry Association and Professional Background Screening Association in Support of Defendants-Appellees and Affirmance, *Kelly v. RealPage, Inc.*, No. 21-1672 (Aug. 5, 2021), https://www.cdiaonline.org/wp-content/uploads/2021/08/2021-08-05-CDIA-Amicus.pdf at 7, 14-19. According to these stakeholders, a request for a "report" would not trigger section 609(a)'s disclosure obligations. These arguments were recently rejected by the Third Circuit. *Kelly v. RealPage, Inc.*, 47 F.4th 202, 219-20 (3rd Cir. Aug. 24, 2022) ("Nothing in the statute's text,

contravene the FCRA.[19] The CFPB interprets the FCRA to require consumer reporting agencies to provide a file disclosure upon receipt of a "request" from a consumer who provides proper identification even if the consumer does not use the specific term "request," "file," "complete file," or any other specific words in making such a request.

To obtain a file disclosure, the FCRA does not require consumers to use any specific language. Instead, the statute requires consumers to do two things: make a "request" and provide proper identification.[20] Once these conditions are satisfied, FCRA section 609(a) states that a consumer reporting agency "shall" provide the file disclosure. The statute's use of "shall" in this context makes clear that a consumer reporting agency may not add additional conditions as a prerequisite to complying with section 609(a).[21]

The statute does not define the term "request" as used in section 609(a). In construing the term's meaning, the Bureau is guided by the statute's broad remedial purposes.[22] As noted above, it is clear that one of Congress's goals in the FCRA was to facilitate consumers' access to their own information and, through such access, to promote the accuracy, privacy, and fairness of the consumer reporting system.[23] These goals would be thwarted if a consumer's right to a file disclosure depended upon the use of specific words—particularly since no such requirement appears in the statute and because consumers are unlikely to know which words any particular

---

context, purpose, or history indicates that any magic words are required for a consumer to effect a 'request' under § 1681g(a) or that a consumer's request for 'my consumer report' is any less effective at triggering the [consumer reporting agency]'s disclosure obligations than a request for 'my file.'").

[19] *Kelly v. RealPage, Inc.*, 47 F.4th 202, 221 (3rd Cir. 2022) ("[W]hen read as a whole, the statute is unambiguous in providing that any generalized 'request' by a consumer for the [consumer reporting agency]'s information about her triggers the CRA's disclose obligation under § 1681g(a).").

[20] 15 U.S.C. 1681g(a), 1681h(a)(1).

[21] This is consistent with longstanding interpretations from FTC staff. *See, e.g.,* Fed. Trade Comm'n, *40 Years of Experience With the Fair Credit Reporting Act: An FTC Staff Report With Summary of Interpretations*, at 75 & n.248, citing 1990 comment 610-2 (2011).

[22] *See supra* note 5.

[23] *See supra* notes 3, 4.

consumer reporting agency expects to hear before honoring its file disclosure obligations. As the Third Circuit explained, if the FCRA were read otherwise:

> [C]onsumers could only access their files pursuant to [section 609(a)] if they are familiar with the esoteric distinction between "files" and "consumer reports" in the Definitions section of the FCRA. Construing [section 609(a)] in this way would severely limit consumers' "access to . . . information in [their] file" and frustrate their ability to know when they are "being damaged by an adverse credit report," or to "correct[] inaccurate information" in their report.[24]

Thus, to obtain a file disclosure under section 609(a), a consumer need not specifically request "[a]ll information in the consumer's file" or request a "complete file" or even use the word "file." For example, a consumer's request to a consumer reporting agency for a "report" or "credit report" or "consumer report" or "file" or "record," along with proper identification, trigger a consumer reporting agency's obligation under section 609(a).

The CFPB's interpretation of section 609(a)—that consumers do not need to use the words "file" or "complete file" to invoke their right to a file disclosure—is consistent with the way Congress itself refers to section 609(a) requests in parts of the FCRA. Although section 609(a) requires disclosure of all information in the consumer's "file" (with only limited, specified exceptions), Congress used the term "consumer report" as a short-hand term for the disclosures required by section 609(a) in some sections that refer to consumer requests and consumer-facing materials.[25] For example, FCRA section 609(c)(1)(B)(i) requires that the Summary of Rights provided to consumers include a description of "the right of the consumer to obtain a copy of a consumer report under [FCRA section 609(a)]."[26] Similarly, FCRA section

---

[24] *Kelly v. RealPage, Inc.*, 47 F.4th 202, 221 (3rd Cir. Aug. 24, 2022); *see also Taylor v. Screening Reports, Inc.*, 294 F.R.D. 680, 684 (N.D. Ga. 2013) ("[A] consumer who requests his 'report,' without limitation, is entitled to his entire consumer file.").
[25] Presumably Congress appreciated that "consumer report" is a an easy-to-understand term for consumers even if it is somewhat imprecise in describing what must be disclosed under section 609(a).
[26] 15 U.S.C. 1681g(c)(1)(B)(i).

612(a)(1), which requires nationwide consumer reporting agencies and nationwide specialty consumer reporting agencies to "make all disclosures pursuant to section [609(a)]" available for free annually, later refers to such file disclosures as "consumer reports" when it refers to a "streamlined process for consumers to request consumer reports under [FCRA section 612(a)(1)(A)]."[27]

2. *Information Required to Be Disclosed Under FCRA Section 609(a)(1)*

Section 609(a) of the FCRA generally requires consumer reporting agencies to, upon request, "clearly and accurately" disclose "all information in the consumer's file at the time of the request." To meet this standard, a file disclosure must be understandable to the average consumer.[28] It must assist a consumer in identifying inaccuracies in their file, exercising their rights to dispute any incomplete or inaccurate information, and knowing when they are being impacted by adverse information in their file.[29]

Some consumers are experiencing difficulty in obtaining clear, accurate, and complete file disclosures, particularly from background screening companies. As discussed below, in this advisory opinion the Bureau is highlighting that (1) section 609(a)(1) of the FCRA requires that a consumer reporting agency clearly and accurately disclose to a consumer all information in the consumer's file at the time of the request, including, among other things, all information the consumer reporting agency provided or might provide to a user, and (2) when a consumer reporting agency provides only summarized information to a user, section 609(a)(1) of the FCRA

[27] 15 U.S.C. 1681j(a)(1). The implementation of free file disclosure requirement for nationwide consumer reporting agencies also makes it clear that consumers do not need use the term "file" or "complete file" to invoke their rights under FCRA section 609(a). FCRA section 612(a)(1)(B) requires the nationwide consumer reporting agencies to make free annual section 609(a) disclosures via a "centralized source." The nationwide consumer reporting agencies do so through the website annualcreditreport.com, which is the only authorized website for obtaining such disclosures and which refers to those disclosures as "credit reports." 12 CFR 1022.136.
[28] *See, e.g.*, *Shaw v. Experian Info. Sols., Inc.*, 891 F.3d 749, 759 (9th Cir. 2018).
[29] 15 U.S.C. 1681i(a); 1681s-2.

requires that the consumer reporting agency provide the consumer with the information that formed the basis of the summarized information given to the user.

Section 609(a) generally requires a consumer reporting agency to provide a consumer with a file disclosure that, among other things, accurately reflects the information the consumer reporting agency provided or might provide to a user.[30] For example, a consumer reporting agency must provide a file disclosure to the consumer that allows the consumer to see criminal history information in the format that users see or will see it, so that the consumer can check for any inaccuracies and exercise their rights to dispute any information that may be inaccurate as presented to users (such as duplicative listings for a single case).

Additionally, there are a number of situations under the FCRA where a consumer reporting agency must provide information that is not or would not be included in a user report when providing a file disclosure under FCRA section 609(a).[31] One example of such a situation is when only summarized information, such as a credit or risk score, a tenant screening score, or a recommendation is provided to users. The CFPB interprets FCRA section 609(a)(1)'s requirement to disclose to the consumer "all information in the consumer's file at the time of the request" to include information that formed the basis of summarized information that a consumer reporting agency provided to a user. Providing only summarized information to users does not relieve a consumer reporting agency of its obligations under the plain language of section 609(a)(1) to provide to the consumer "all information in the consumer's file at the time of the request."

---

[30] Note that the requirement in FCRA section 609(a)(1) that consumer reporting agencies disclose "[a]ll information in the consumer's file at the time of the request" is subject to exceptions. For example, section 609(a)(1)(B) does not require consumer reporting agencies to disclose to a consumer any information concerning credit scores or any other risk scores or predictors relating to the consumer. *See* 15 U.S.C. 1681g(a)(1)(B).

[31] *See*, *e.g.*, 15 U.S.C. 1681g(a)(2) (requiring disclosure of the sources of the information).

If a consumer reporting agency disclosed nothing to a consumer when it only provided summarized information to a user, the consumer would be unaware of the records upon which the summarized information was based, undermining the consumer's ability to exercise their right to dispute any incomplete or inaccurate information contained in their file.[32] This would also be the case if a consumer reporting agency disclosed to a consumer the summarized information it provided to a user without also disclosing the underlying information in the file.

The Bureau's interpretations regarding information required to be disclosed under section 609(a)(1) are consistent with the FCRA's purposes. When initially passing the FCRA, Congress stated that "under this bill credit reporting agencies are required to make full disclosure to the consumer of all of the information obtained. The consumer will then be given the opportunity to correct inaccurate or misleading data."[33] The FCRA provides consumers the right to dispute any incomplete or inaccurate information contained in the consumer's file.[34] A consumer's ability to exercise this right is damaged if consumer reporting agencies withhold information that they are required to disclose under section 609(a)(1), including information that reveals inaccuracies in reports provided to users or information that forms the basis of summarized information (such as tenant screening scores). Withholding such information would also damage a consumer's ability to know when they are being impacted by adverse information in their file.

*3. Sources of Information under FCRA Section 609(a)(2)*

Section 609(a) of the FCRA generally requires consumer reporting agencies to, upon request, disclose all information in the consumer's file at the time of the request and the sources

---

[32] 15 U.S.C. 1681i(a).
[33] 115 Cong. Rec. 33408, 33412 (1969). *See also Selvam v. Experian Info. Sols., Inc.*, 651 F. App'x 29, 33 (2d Cir. 2016) ("The purpose of § 1681g…is to enable consumers to obtain information in order to dispute any potential inaccuracies in the file so that inaccurate information is not sent to third parties.").
[34] 15 U.S.C. 1681i(a).

of the information.[35] The CFPB is aware that, in response to these consumer requests, some consumer reporting agencies are not disclosing all sources of an item of information in the consumer's file and instead have disclosed only one source of the item of information. For example, some consumer reporting agencies that acquire public record information (e.g., eviction proceeding records) from a vendor are only disclosing to consumers the jurisdiction that was the original source for these records (e.g., the county court). The Bureau continues to interpret FCRA section 609(a)(2)'s requirement to disclose "the sources of the information" to include both the original source and any intermediary or vendor source (or sources) that provide the item of information from the original source to the consumer reporting agency.

The CFPB's interpretation is based on the plain language of FCRA section 609(a)(2) itself, which refers to "sources" in the plural. The statute does not limit this requirement to "a source" or "the original source" of the information.[36] This interpretation is also consistent with the FTC's *40 Years Report*, which states that "CRAs must disclose the sources of information in the consumer's file, except for sources of information acquired solely for use in preparing an investigative consumer report."[37]

---

[35] 15 U.S.C. 1681g(a). FCRA section 609(a)(2) requires disclosure of "[t]he sources of the information" but provides that "the sources of information acquired solely for use in preparing an investigative consumer report and actually used for no other purpose need not be disclosed: *Provided*, That in the event an action is brought under this title, such sources shall be available to the plaintiff under appropriate discovery procedures in the court in which the action is brought." 15 U.S.C. 1681g(a)(2).

[36] Courts have found that all sources of the information must be disclosed to consumers. *See, e.g.*, *Clark v. Trans Union LLC*, No. 3:15cv391, 2016 WL 7197391, at *11 (E.D. Va. Dec. 9, 2016) (stating that "TransUnion's argument that it properly disclosed the 'ultimate sources' of information, but not the supposedly less pertinent LexisNexis disclosure as to how the data was collected, or by whom, does not persuade"); *Dennis v. Trans Union, LLC*, 2014 WL 5325231, at *7 (E.D. Pa. Oct. 20, 2014) (stating that "[a]s the plain language of Section 1681g(a)(2) does not limit 'sources' in any way, the Court will not impose a limitation on the number of sources a CRA could have, and therefore be required to disclose, for a particular piece of information"). *But see Shimon v. Equifax Info. Servs*. LLC, 994 F.3d 88, 93 (2d Cir. 2021) (granting summary judgment to consumer reporting agency because not "objectively unreasonable" to fail to disclose third-party vendor as the source of information).

[37] Fed. Trade Comm'n, *40 Years of Experience With the Fair Credit Reporting Act: An FTC Staff Report With Summary of Interpretations*, at 71 (2011). FTC staff published the *40 Years Report,* an updated compilation of past FTC interpretations of the FCRA, to coincide with the transfer of authority to the Bureau. Effective July 21, 2011, the Dodd-Frank Act transferred rulemaking authority related to most of the FCRA to the Bureau, giving the Bureau the primary regulatory and interpretive roles under the FCRA.

Additionally, and as described in part I.C.1, a consumer does not need to use specific language to trigger a consumer reporting agency's obligations under FCRA section 609(a)(2). As such, consumers do not need to specifically request that consumer reporting agencies identify *all* the sources of the information in their file in in order to be entitled to receive such information. This interpretation is consistent with the principle that the FCRA should be construed in light of its broad remedial purpose.[38]

The Bureau's interpretation also is consistent with the FCRA's purposes. Congress passed the FCRA in part to "prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report."[39] The FCRA achieves this by, among other things, providing consumers the right to obtain, upon request, all information in their file and the sources of that information and the right to dispute any incomplete or inaccurate information. The statutory right provided by FCRA section 609(a)(2) enables consumers to understand the true sources of any incomplete or inaccurate information in their file and helps them to address such errors more effectively.[40] For example, many consumer reporting agencies, including background screening companies, obtain public records information from vendors. Vendors often provide only distilled versions of these records that do not contain all the information housed by the jurisdiction from which the records originated and sometimes contain mistakes or fail to include the most up-to-date status of the public records. If a consumer

[38] *See supra* note 5.
[39] S. Rep. No. 91-517, at 1 (1969).
[40] Courts have recognized the importance of the disclosure of all sources for consumers to dispute inaccuracies and prevent the reoccurrence of inaccuracies. *See, e.g.*, *Clark v. Trans Union LLC*, No. 3:15cv391, 2016 WL 7197391, at *11 (E.D. Va. Dec. 9, 2016) (stating that "the omission of LexisNexis as a source deprived Clark of her congressionally-mandated right to correct the mistake with LexisNexis, or with anyone else to whom LexisNexis also may have disclosed the inaccurate information. Moreover, the failure to include LexisNexis in the report creates a material risk that LexisNexis could continue to report inaccurate information to others in the future."); *Leo v. AppFolio, Inc.*, No. 17-5771 RJB, 2018 WL 623647, at *8 (W.D. Wash. Jan. 30, 2018) (noting that AppFolio's failure to properly identify the vendor who provided the data would make it harder for the plaintiff to correct the misreporting).

reporting agency discloses to a consumer only the original jurisdiction as the source of the information and does not also disclose the vendor, or conversely, if the consumer reporting agency discloses to a consumer only the vendor and does not also disclose the original source of the information, the consumer may not be able to correct any erroneous public records information that could be included in their files at all of the consumer reporting agencies that receive data from the vendor.[41] Interpreting FCRA section 609(a)(2) to allow a consumer reporting agency to disclose to a consumer only a single source of the information, and not all sources of the information, would undermine the FCRA's purposes by limiting consumers' ability to understand the sources of the often highly sensitive information in their file and to address and prevent further dissemination of incomplete or inaccurate data.

In addition to provisions authorizing Federal and State enforcement,[42] the FCRA contains two provisions relating to civil liability to consumers for noncompliance. Section 617 provides that "any person who is *negligent* in failing to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to" the consumer's actual damages, and costs and reasonable attorney's fees.[43] Section 616 provides that "any person who *willfully* fails to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to" actual or statutory damages of up to $1,000 per violation, such punitive damages as the court allows, and costs and reasonable attorney's fees.[44] A violation is willful when it is inconsistent with "authoritative

[41] *See*, *e.g*., *Clark v. Trans Union LLC*, No. 3:15cv391, 2016 WL 7197391, at *11 (E.D. Va. Dec. 9, 2016); *Leo v. AppFolio, Inc*., No. 17-5771 RJB, 2018 WL 623647, at *8 (W.D. Wash. Jan. 30, 2018).
[42] 15 U.S.C. 1681s.
[43] 15 U.S.C. 1681o (emphasis added).
[44] 15 U.S.C. 1681n (emphasis added); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57-58 (2007) (construing meaning of "willful").

guidance" from a relevant agency.[45] As with any guidance issued by the CFPB on the FCRA, or predecessor agencies that were responsible for administering the FCRA prior to the CFPB's creation, consumer reporting agencies risk liability under section 616 if they violate the FCRA in a manner described in this advisory opinion, regardless of whether the consumer reporting agencies were previously liable for willful violations prior to its issuance.

**II. Regulatory Matters**

This advisory opinion is an interpretive rule issued under the Bureau's authority to interpret the FCRA, including under section 1022(b)(1) of the Consumer Financial Protection Act of 2010,[46] which authorizes guidance as may be necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of Federal consumer financial laws.[47]

The Bureau has determined that this advisory opinion does not impose any new or revise any existing recordkeeping, reporting, or disclosure requirements on covered entities or members of the public that would be collections of information requiring approval by the Office of Management and Budget under the Paperwork Reduction Act.[48]

Pursuant to the Congressional Review Act,[49] the Bureau will submit a report containing this interpretive rule and other required information to the United States Senate, the United States House of Representatives, and the Comptroller General of the United States prior to the rule's published effective date. The Office of Information and Regulatory Affairs has designated this interpretive rule as not a "major rule" as defined by 5 U.S.C. 804(2).

[45] *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 (2007); *Fuges v. Sw. Fin. Servs., Ltd.*, 707 F.3d 241, 253 (3d Cir. 2012).
[46] Pub. L. 111-203, 124 Stat. 1376 (2010).
[47] 12 U.S.C. 5512(b)(1).
[48] 44 U.S.C. 3501-3521.
[49] 5 U.S.C. 801 *et seq*.

**Rohit Chopra,**

*Director, Consumer Financial Protection Bureau.*

# Exhibit E

**IN THE MATTER OF:**

**Equifax Information Services LLC,**
**Experian Information Solutions, Inc., and**
**TransUnion LLC**

**ASSURANCE OF VOLUNTARY COMPLIANCE/**
**ASSURANCE OF VOLUNTARY DISCONTINUANCE**

This Assurance of Voluntary Compliance/Assurance of Voluntary Discontinuance ("Settlement" or "Assurance") is entered into between the States of Alabama, Alaska, Arizona, Arkansas, Florida, Georgia,[1] Hawaii,[2] Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Missouri, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Vermont, and Wisconsin (the "States" or individually, a "State"), acting through their respective Attorney General, Departments of Justice, or Offices of Consumer Protection ("Attorneys General"), and the consumer reporting agencies Equifax Information Services LLC, Experian Information Solutions, Inc., and TransUnion LLC (each, a "CRA," and collectively, the "CRAs"), to settle concerns that the CRAs' conduct has violated the Fair Credit Reporting Act (the "FCRA," 15 U.S.C. § 1681 et seq.) and the States' consumer protection laws relating to unfair and deceptive

---

[1] The State of Georgia is represented in this matter by the Georgia Governor's Office of Consumer Protection, an agency that is not part of the Georgia Attorney General's Office but is authorized to enforce Georgia's Fair Business Practices Act ("FBPA"). For simplicity, the term "Attorneys General" shall include the Administrator of the FBPA.

[2] Hawaii is being represented in this matter by its Office of Consumer Protection, an agency which is not part of the state Attorney General's Office, but which is statutorily authorized to undertake consumer protection functions, including legal representation of the State of Hawaii. For simplicity, the entire group will be referred to as the "Attorneys General," and such designation, as it includes Hawaii, refers to the Executive Director of the State of Hawaii Office of Consumer Protection.

business acts and practices.[3] The States and the CRAs have agreed to execute this Assurance for the purposes of settlement only.

## I. BACKGROUND

**A.** This Settlement is the result of the CRAs working cooperatively with the Attorneys General of the States.

**B.** The States have each enacted a statute relating to unfair and deceptive business acts and practices.

**C.** The States and the CRAs jointly acknowledge the various findings and statement of purpose expressed by Congress in section 602 of the Fair Credit Reporting Act (the "FCRA," 15 U.S.C. § 1681 et seq.), including: (i) the banking system is dependent upon fair and accurate credit reporting, which is directly impaired by inaccurate credit reports, and public confidence essential to its continued functioning is undermined by unfair credit reporting methods; (ii) the CRAs play a vital role in assembling and evaluating consumer credit information, utilizing an elaborate mechanism for investigating and evaluating the credit worthiness, credit standing, credit capacity,

[3] See generally Ala. Code §§ 8-19-1 to 8-19-15; Alaska Stat. §§ 45.50.471 to 45.50.561; Ariz. Rev. Stat. Ann. §§ 44-1521 to 44-1534; Ark. Code Ann. §§ 4-88-101 to 4-88-905; Fla. Stat. §§ 501.201 to 501.213; Ga. Code Ann. §§ 10-1-390 to 10-1-407; Haw. Rev. Stat. §§ 480-1 to 480-24; Idaho Code Ann. §§ 48-601 to 48-619; 815 Ill. Comp. Stat. 505/1 to 505/12; Ind. Code §§ 24-5-0.5-0.1 to 24-5-0.5-12; Iowa Code §§ 714.16 to 714.16A; Kan. Stat. Ann. §§ 50-623 to 50-679a; La. Rev. Stat. Ann. §§ 51:1401 to 51:1427; Me. Rev. Stat. Ann. tit. 5, §§ 205A to 214; Md. Code Ann., Com. Law §§ 13-101 to 13-501 (West); Mass. Gen. Laws Ann. ch. 93A, §§ 1 to 11; Mich. Comp. Laws §§ 445.901 to 445.922; Mo. Rev. Stat. §§ 407.010 to 407.1500; Neb. Rev. Stat. §§ 59-1601 to 59-1623 and §§ 87-301 to 87-306; Nev. Rev. Stat. §§ 598.0903 to 598.0999; N.M. Stat. §§ 57-12-1 to 57-12-26; N.C. Gen. Stat. §§ 75-1.1 to 75-16.2, § 75-41; N.D. Cent. Code §§ 51-15-01 to 51-15-11; Ohio Rev. Code Ann. §§ 1345.01 to 1345.13 (West); Or. Rev. Stat. §§ 646.605 to 646.656; 73 Pa. Stat. Ann. §§ 201-1 to 201-9.3 (West); R.I. Gen. Laws §§ 6-13.1-1 to 6-13.1-29; Tenn. Code Ann. §§ 47-18-101 to 47-18-130; Tex. Bus. & Com. Code Ann. §§ 17.41 to 17.63 (West); Vt. Stat. Ann. tit. 9, §§ 2451 to 2481x; Wis. Stat. §§ 100.18(1), (2), (9) & (11), 100.195, 100.20, 100.313, 100.52, 100.54, 100.545 & 100.55.

significant changes to the scheduled dates established in the Implementation Schedule may be made with the consent of the Executive Committee, which consent shall not be unreasonably withheld.

## IV. POLICIES, PRACTICES, AND PROCEDURES

**A.** The CRAs shall comply with such State, Federal, and/or local laws, rules and regulations as now constituted or as may hereafter be amended which are applicable to the CRAs, including but not limited to the FCRA and the State Consumer Protection laws cited in footnote 3 of this Settlement.

**B.** The CRAs shall comply with section 607(b) of the FCRA, 15 U.S.C. § 1681e(b), a copy of which is attached as Exhibit A, by following reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom a consumer report relates whenever the CRAs prepare a consumer report.

**C.** The CRAs shall comply with section 611 of the FCRA, 15 U.S.C. § 1681i, a copy of which is attached as Exhibit B, including by:

*1.* Completing reasonable reinvestigations of consumer disputes within thirty (30) days or, if the CRA receives information from the consumer during that thirty (30) day period that is relevant to the reinvestigation, within forty-five (45) days, unless the CRA reasonably determines that the consumer dispute is frivolous or irrelevant, including by reason of a failure by a consumer to provide sufficient information to investigate the disputed information;

*2.* Providing, before the expiration of five (5) business-days beginning on the date on which the CRA receives notice of a dispute from any consumer, notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice shall include all relevant information regarding the dispute that CRA has received from the consumer;

*3.* After completing a reasonable reinvestigation of any information disputed by a consumer in which the item of information is found to be inaccurate or incomplete or cannot be verified:

a. Promptly deleting that item of information from the consumer's file or modifying that item of information, as appropriate, based on the results of the reinvestigation; and

b. Promptly notifying the furnisher of that information that the information has been modified or deleted from the consumer's file;

*4.* Notifying a consumer that the CRA has terminated its reinvestigation of a consumer dispute, not later than five (5) business days after making such a determination, when the CRA terminates a reinvestigation as frivolous or irrelevant;

*5.* Maintaining reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is

deleted pursuant to a reinvestigation (other than information that is reinserted in accordance with section 611(a)(5)(B) of the FCRA, 15 U.S.C. § 1681i(a)(5)(B));

*6.* Providing written notice to a consumer of the results of a reinvestigation not later than five (5) business days after the completion of the reinvestigation; and

*7.* Not reinserting any information that is deleted from a consumer's file pursuant to a reasonable reinvestigation unless the person who furnishes the information certifies that the information is complete and accurate, in which case the CRA shall notify the consumer of the reinsertion not later than five (5) business days after the reinsertion, and provide to the consumer in writing the contact information of the furnisher connected with the reinsertion and a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the disputed information.

**D.** In addition, pursuant to the Implementation Schedule, each of the CRAs shall undertake the specific actions set forth in Section IV(E)-(H) below, which are intended to: (i) expand on the FCRA's mandate to follow reasonable procedures to assure maximum possible accuracy of data maintained within the CRAs' respective credit reporting databases; (ii) set additional standards for the data reporting practices of furnishers that will further enhance and improve the quality of data reported to the CRAs; (iii) enhance consumers' experiences with the CRAs when disputing items on their credit reports; (iv) enhance and clarify communications to consumers regarding direct-to-consumer products; (v) improve consumer education on best practices for

communicating with and engaging the credit reporting industry—including the CRAs and furnishers—so that consumers better understand the important role they play in fostering accurate credit reporting; and (vi) enhance the mechanisms through which the CRAs monitor furnishers to improve the quality of data received from furnishers, and more easily identify data reporting and dispute response trends.

## E. <u>Data Accuracy and Quality</u>

### *1. Reporting of Collection Data*

a. The CRAs shall continue to require collection agencies or debt purchasers ("Collection Furnishers") to furnish the name of the Original Creditor and the Metro 2 creditor classification codes (the "Creditor Classification Codes"). The CRAs shall revise training materials and adopt policies and procedures to notify and instruct Collection Furnishers that the name of the Original Creditor and the use of Creditor Classification Codes are mandatory reporting requirements, and the CRAs shall reject data that is not provided with the name of the Original Creditor and the Creditor Classification Codes after a point in time to be determined by the CRAs following reasonable notice to the Collection Furnishers, as set forth in the Implementation Schedule.

b. The CRAs shall implement a process designed to effectively identify Collection Furnishers who misreport or misuse the Creditor Classification Codes on a recurring basis, such as, for example, by using a default value. The CRAs shall take corrective action against Collection Furnishers identified pursuant to this provision.

c. The CRAs shall prohibit Collection Furnishers from reporting debt that did not arise from any contract or agreement to pay (including, but not limited to, certain fines, tickets, and other assessments).

d. The CRAs shall implement a process designed to effectively remove from the CRAs' respective credit reporting databases any existing data reported by Collection Furnishers relating to the collection of debt that did not arise from a contract or agreement to pay. Such efforts may include, but are not limited to, sharing best practices for key words and screening procedures designed to identify debt that did not arise from any contract or agreement to pay.

e. The CRAs shall require Collection Furnishers to regularly reconcile data relating to accounts in collection that have not been paid in full. This regular reconciliation will be accomplished, in part, by periodic removal or suppression of all collection accounts that have not been updated by the Collection Furnisher within the last six months. In addition, the CRAs shall revise training materials and instruct new and existing Collection Furnishers on accurately reporting and deleting accounts that are sold, transferred, or no longer managed by the reporting entity.

***2. Retire Metro 1 Reporting Format***

Not later than ninety (90) days following the Effective Date, the CRAs shall announce the full retirement of the Metro 1 data reporting format. Thereafter, at the end of a reasonable notice period that provides furnishers with sufficient time to undertake all

conducted in person or via teleconference or video conference, but at least one meeting per year shall take place in person.

4. ***Functions of the Working Group***

a. Coordinate and Review Furnisher Analytics and Metrics

The Working Group shall coordinate the development and review of reports and metrics that analyze key data related to furnishers, including but not limited to, on an industry basis (e.g., collections, student loans), on a time-series basis by industry (i.e., a trending analysis that examines data over an extended time period), and/or in the form of benchmarking reports. These reports and metrics may include, but are not limited to, the following topics and purposes:

i. Reports and trends focused on data furnished to the CRAs, including analyses of the accounts receivable data regularly furnished to each CRA (i.e., tradelines), and reports and metrics that focus on rates of consumer complaints, furnisher disputes and responses, and dispute outcomes;

ii. Reports and metrics focused on furnisher reporting by industry, including analyses of the frequency and timeliness of reporting, reports that evidence the proper use of Metro 2 codes, reports on data rejection rates and reasons for rejecting data submitted by a furnisher, and reports on other similar statistical data; and

iii. Benchmarking reports based on factors such as industry, portfolio type, and/or portfolio size, in order to compare the data and trends identified in

the reports described above to further review the quality of the data furnished to the CRAs.

b. Identify Data Accuracy Best Practices

The Working Group shall discuss each CRA's policies and practices pertaining to data accuracy and furnishers in order to identify potential best practices. The Working Group's discussions may include, but not be limited to, topics such as: minimum identification elements on newly opened trade and collection data (see supra Section IV(E)(5)); uniform standards regarding the collection of public record data (see supra Section IV(E)(6)); additional types of consumer disputes that warrant escalated handling, such as certain repeat consumer disputes not previously determined to be irrelevant or frivolous (see supra Section IV(F)(7)); furnisher credentialing and onboarding; data intake procedures; data hygiene tools and procedures; furnisher monitoring techniques; reports and trending analysis tools; policies designed to address fraud and data accuracy risk; credit reporting issues for vulnerable demographics such as foster care youth, seniors, and military personnel; and other policies and procedures designed to enhance data quality. The Working Group shall identify potential best practices and policies designed to lead to more effective furnisher monitoring and/or enhanced data quality and accuracy, which may include communicating with furnishers regarding relevant reports and metrics of the Working Group.

**In the Matter of:**
***Equifax Information Services LLC, (EAGO No. 453892)***
***Experian Information Solutions, Inc., (EAGO No. 453891) and***
***TransUnion LLC (EAGO No. 453890)***

**Assurance of Voluntary Compliance / Assurance of Discontinuance**

Dated: May 20, 2015

MICHAEL DEWINE
Ohio Attorney General

BY: ______________________
TERESA A. HEFFERNAN
Senior Assistant Attorney General

BY: ______________________
JEFFREY R. LOESER
Associate Assistant Attorney General

BY: ______________________
MICHAEL S. ZIEGLER
Principal Attorney General

**In the Matter of:**
***Equifax Information Services LLC,***
***Experian Information Solutions, Inc., and***
***TransUnion LLC***

**Assurance of Voluntary Compliance / Assurance of Discontinuance**

Dated: May 14, 2015

EXPERIAN INFORMATION SOLUTIONS, INC.

By: ______________________
DANIEL J. MCLOON
Jones Day
Counsel for Experian

By: ______________________
DARRYL GIBSON
Group General Counsel

# Exhibit F

# EXHIBIT F

# HARD INQUIRY SUMMARY CHART

Summary of Hard Inquiries Reflected in Plaintiff's April 28, 2026 Consumer File Disclosure and Supporting Plaintiff's Allegations that Third Parties Requested or Obtained Consumer Reports Concerning Plaintiff.

# EXHIBIT F

## HARD INQUIRY SUMMARY CHART[1]

**Summary of Hard Inquiries Reflected in Plaintiff's Consumer File Disclosure**

| No. | Inquiry Recipient | Inquiry Date |
|---|---|---|
| 1 | CAP1/NEIMN | March 5, 2026 |
| 2 | JPMCB CARD | March 5, 2026 |
| 3 | JPMCB CARD | December 16, 2025 |
| 4 | CARVANA LLC | October 31, 2025 |
| 5 | FNB OMAHA | October 3, 2025 |
| 6 | CELTIC/CONTFIN | July 30, 2025 |
| 7 | BK OF AMER | June 12, 2025 |
| 8 | JPMCB CARD | June 12, 2025 |
| 9 | JPMCB CARD | June 10, 2025 |
| 10 | CAP ONE NA | June 8, 2025 |
| 11 | JPMCB CARD | June 6, 2025 |
| 12 | COMENITYCAPITAL/NFLVS | September 17, 2024 |
| 13 | CAP ONE NA | September 13, 2024 |
| 14 | ONEMAIN | September 10, 2024 |
| 15 | COMENITYCAPITAL/NFLVS | August 26, 2024 |

[1] The foregoing chart summarizes the fifteen (15) hard inquiries reflected in Plaintiff's Consumer File Disclosure. Each hard inquiry reflects that a third party requested or obtained consumer report information concerning Plaintiff from Defendant. Defendant possesses the complete records identifying each report recipient, report date, permissible purpose, and the contents of the consumer reports furnished.

**SUPREME COURT OF THE STATE OF NEW YORK**

**COUNTY OF KINGS**

-----------------------------------------------------------------------X

ADAM SHREM,

Index No. ______________ / 2026

Plaintiff,

-against-

EXPERIAN INFORMATION SOLUTIONS, INC.,

Defendant.

-----------------------------------------------------------------------X

**NOTICE OF COMMENCEMENT OF ACTION SUBJECT TO MANDATORY ELECTRONIC FILING**

**PLEASE TAKE NOTICE** that the matter captioned above, which has been commenced by filing of the accompanying documents with the County Clerk, is subject to mandatory electronic filing pursuant to Section 202.5-bb of the Uniform Rules for the Trial Courts. This notice is being served as required by Subdivision (b)(3) of that Section.

The New York State Courts Electronic Filing System ("NYSCEF") is designed for the electronic filing of documents with the County Clerk and the court and for the electronic service of those documents, court documents, and court notices upon counsel and self-represented parties. Counsel and/or parties who do not notify the court of a claimed exemption (see below) as required by Section 202.5-bb(e) must immediately record their representation within the e-filed matter on the Consent page in NYSCEF. Failure to do so may result in an inability to receive electronic notice of document filings.

Exemptions from mandatory electronic filing are limited to: (1) attorneys who certify in good faith that they lack the computer equipment and, along with all employees, the requisite knowledge to comply; and (2) self-represented parties who choose not to participate in electronic filing.

For additional information about electronic filing, including access to Section 202.5-bb, consult the NYSCEF website at **www.nycourts.gov/efile** or contact the NYSCEF Resource Center at 646-386-3033 or **efile@nycourts.gov**.

Dated: New York, New York
June 18, 2026

THE LAW OFFICE OF
ELLIOT M. ELO, ESQ. PLLC

By: s/ Elliot M. Elo
Elliot M. Elo, Esq.
42 West 48th Street, Floor 2
New York, New York 10036-1701
Telephone: (212) 302-1257
Facsimile: (212) 302-1648
Email: elliot@elolawfirm.com
*Attorney for Plaintiff*

**TO:**

**Experian Information Solutions, Inc.**
c/o C T Corporation System, registered agent
28 Liberty Street, New York, New York 10005

ATTORNEY(S) : Brian Ponder LLP
INDEX # : 522777/2026
PURCHASED/FILED : June 18, 2026
STATE OF : NEW YORK
COURT : Supreme
COUNTY/DISTRICT : Kings

## AFFIRMATION OF SERVICE - SECRETARY OF STATE

Adam Shrem

Plaintiff(s)

against

Experian Information Solutions, Inc.

Defendant(s)

STATE OF NEW YORK )
COUNTY OF ALBANY ) SS
CITY OF ALBANY )

**DESCRIPTION OF PERSON SERVED:** Approx. Age: 25 Yrs

Weight: 120 lbs Height: 5'3" Gender: Female Race: White

Hair color: Black Other:

**Robert Guyette**, being duly sworn, deposes and says: deponent is over the age of eighteen (18) years; is not a party to this action, and resides in the State of NY, and that on **June 18, 2026**, at **3:00 PM**, at the office of the Secretary of State of the State of NY, located at 99 Washington Ave, 6th Fl, Albany, New York 12231 deponent served:

**SUMMONS & VERIFIED COMPLAINT WITH EXHIBITS**

on

**Experian Information Solutions, Inc.**,

the Defendant in this action, by delivering to and leaving with **Izeasha Miller** AUTHORIZED AGENT in the Office of the Secretary of State, of the State of New York, personally at the Office of the Secretary of State of the State of New York, two (2) true copies thereof and that at the time of making such service, deponent paid said Secretary of State a fee of $40 dollars; That said service was made pursuant to Section **BUSINESS CORPORATION LAW §306.**

Deponent further says that deponent knew the person so served as aforesaid to be the agent in the Office of the Secretary of State of the State of New York, duly authorized to accept such service on behalf of said defendant.

I affirm this **JUNE 18, 2026**, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, except as to matters alleged on information and belief and as to those matters I believe it to be true, and I understand that this document may be filed in an action or proceeding in a court of law.

X [signature]
ROBERT GUYETTE

**Invoice·Work Order #** 2625870
Attorney File # **Shrem vs Experian**